89 Cal.App.2d 329 (1948)
Estate of HERMANN FRIDERICH SAHLENDER, Deceased. THE ANGLO CALIFORNIA NATIONAL BANK OF SAN FRANCISCO, as Coexecutor and as Trustee, etc., et al., Appellants,
v.
DORA RAITHEL, as Coexecutrix, etc., Respondent.
Civ. No. 13698. 
California Court of Appeals. First Dist., Div. One. 
Dec. 27, 1948.
 Tom C. Clark, United States Attorney General, David L. Dazelon, Assistant United States Attorney General, Frank J. Hennessy, United States Attorney, Arthur J. DeLorimier, Assistant United States Attorney, Jas. L. Morrisson, J. Roger Wollenberg, Attorneys for Office of Alien Property, Wm. F. Rose and Carl E. Day for Appellants.
 Melvin, Faulkner, Sheehan & Wiseman and Gregory, Hunt, Melvin & Faulkner for Respondent.
 PETERS, P. J.
 Hermann Fridrich Sahlender died testate in August of 1945, leaving an estate that has been inventoried at $129,159.17. He left surviving him as his heir at law the respondent, his daughter. His will was executed in September, 1940, and is a lawyer-drafted document. Respondent, when the will was executed, and at the present time, is a childless widow. In 1940, she was 50 years of age. The will devises the major portion of the estate to the Anglo California National Bank in trust. Respondent petitioned the probate court for ratable distribution, contending that certain of the claimed nonseverable trust provisions violated both the rule against perpetuities and the rule against restraints on alienation, and that, for this reason, the entire trust was void. She, therefore, contended that the entire estate should be distributed to her as sole heir at law of her father. The probate court found that the trusts created by articles V and VI of the will violated both of the rules above mentioned; that such invalid provisions were not separable from the valid ones, and that respondent was entitled to the entire estate. Ratable distribution as prayed for was decreed. From this decree the Anglo Bank, coexecutor of the will and trustee under the *333 trusts, and the Attorney General of the United States, as successor of the Alien Property Custodian, representing certain German remaindermen, appeal.
 The will, so far as pertinent here, after first providing certain specific bequests to respondent, then devises the residue of the estate to the bank in trust. The income of the trust was made payable to the respondent for life. Paragraph (c) of article V of the will then provides as follows: "During such time (including the probate period) as my said daughter (Mrs.) Dora Raithel, is deceased, but one or more of her issue are living, the said net income shall be distributed to the living issue of my said daughter, if any, by right of representation, until twenty-four (24) years have elapsed from the date of my death, at which time, or if twenty-four (24) years have already so elapsed at the time of my daughter's death, the trust shall terminate, vest and be distributed in accordance with the provisions of subparagraph (d) hereinafter set forth, unless one or more of her issue were also living at the time of my death and survive said twenty-four (24) year period, in which event the said net income shall continue to be so distributed, until the death of the last issue of my said daughter who was so living at the time of my own death, and who survived said twenty-four (24) year period, or until the happening of any of the contingencies hereinafter set forth, at which time the trust shall terminate, vest and be distributed as aforesaid, provided, if my said daughter survives me, but at the time of her death leaves no issue of hers then living, the trust shall at the time of her death terminate, vest and be distributed as aforesaid, further provided, if all of her issue, if any, whether or not living at the time of my death, die previous to the expiration of said twenty-four (24) year period, then in such event, upon the death of the last survivor of them, the trust shall also terminate, vest and be distributed as aforesaid, further provided, the said trust shall also terminate, vest and be distributed as aforesaid, anything hereinbefore to the contrary notwithstanding (my said daughter, of course, being deceased) when the youngest living of her children has attained the age of twenty-five (25) years."
 Paragraph (d) of article V is the provision relating to distribution of the trust corpus upon its termination. It provides that at that date the corpus is to be divided into equal shares; that one share shall be distributed to each then living child, if any, of Dora Raithel: that one share shall be distributed to the issue, if any, of any deceased child of Dora *334 Raithel; one share each to three named relatives and two named friends of decedent then living in Germany, if living, and, if dead, to the children or issue of such deceased remaindermen. It is also provided that if any of the remainder interests should lapse by death of the distributee prior to the "termination" and "vesting" of the trust, such share or shares should inure to the benefit of the other distributees, and if none of the named beneficiaries is alive when the trust terminates, the corpus is to go to the heirs at law of decedent. Article VI of the will provided that if neither his daughter nor her issue survived the testator, then, upon his death, the residue of the estate was to go as provided by paragraph (d) of article V of the will.
 Thus, the trust was so drafted that respondent was to get a life income, but in no event would ever get any portion of the corpus. The corpus was to go to the children of respondent, if any, and to certain named German relatives and friends, or to their children.
 The trial court found (finding X): "The trust created by Articles V and VI of the will of said decedent may continue for a period longer than the continuance of lives of persons in being at the time of the death of the testator and twenty-one years thereafter, and the interests created by said trust and described in Paragraph IX of these findings may not vest until the expiration of such period. The absolute power of alienation is suspended for a period longer than the continuance of lives of persons in being at the time of the death of the testator, and for a period longer than twenty-five years from the date of the death of the testator."
 Finding XI reads as follows: "The life and remainder interests created by the trust set forth in Articles V and VI of the will of the testator and described in Paragraph IX of these findings of fact are non-separable from the other provisions of the trust."
 One of the conclusions of law reads as follows: "That the trust attempted to be created by the last will and testament of Hermann Friderich Sahlender, alias, deceased, in Articles V and VI of said will ... is void; that the whole of the trust is invalid, and that to uphold a portion of the trust in view of the provisions declared invalid above would defeat the intention of the testator."
 The court also concluded that the decedent died intestate as to the portion of his estate attempted to be bequeathed in trust, and that all of this portion of the estate should be distributed *335 to respondent, absolutely, as decedent's sole heir at law.
 At the threshold of this appeal we are met by the contention, vigorously and ably asserted by appellant bank, that in this state we do not have the common-law rule against perpetuities, but only have the statutory rule against restraints on alienation found in sections 715 and 716 of the Civil Code. Respondent argued below, and now contends, that in this state we have both rules, one by reason of the Civil Code sections, and the other, the rule against perpetuities, made part of our law by article XX, section 9, of the Constitution, [fn. 1] or by reason of section 4468 of the Political Code, [fn. 2] making the common law, except in certain cases, the rule of decision in this state. The determination of this question becomes of great importance because, as will be later pointed out, certain provisions of this trust violate the rule against perpetuities, but none of them violates the rule against restraints on alienation.
 [1] The two rules are, of course, quite different. One requires that within a fixed period there be persons in being capable of conveying an absolute interest in possession. That is the rule against restraints on alienation. The other requires that within a fixed period the absolute interest must vest. That is the rule against perpetuities, or, more accurately, the rule against remoteness of vesting.
 The common law judges were much concerned with preventing the tying up of estates for long periods of time. Text writers are agreed that, when property was tied up in such fashion, it was known as a "perpetuity." Two methods were devised at common law to prevent this tying up process. The first and original method was to require that estates be alienable within a fixed period which ultimately became fixed at lives in being plus 21 years. The second was devised as early as 1685 in the Duke of Norfolk's Case, 3 Ch. Cases 1 (1685). It requires the vesting of estates within lives in being. (Gray, Rule Against Perpetuities (4th ed.) 2.1, p. 4; Rest., Property (div. IV), p. 2123 et seq.) By the middle of the Eighteenth *336 Century the vesting period had become fixed at lives in being, plus 21 years, plus the period of gestation. (Gray, Rule Against Perpetuities (4th ed.) 169 et seq., p. 161 et seq.)
 The main thesis of appellants' argument is that, although the two rules were known to the common law prior to 1849, the distinctions between them were not crystallized until Gray first published his book in 1886. Prior to that time, so goes the argument, the generally accepted view was that the common law only prohibited restraints on alienation and was not concerned with vesting. This thought is expressed as follows by Professor Burby in an article in 1 Southern California Law Review 107, at page 108: "It is to be noted, however, that it was not till Professor Gray made a thorough investigation of the subject, the results of which investigation form the basis for his treatise on The Rule Against Perpetuities, that the rule was generally understood as one against the remoteness of vesting. Prior to that time there was considerable confusion regarding the subject, some authorities taking the view that the common-law rule was against suspension of the power of alienation."
 The same thought is expressed by Robert Gerdes in 16 California Law Review 81, at page 87, as follows: "It was the thesis of Mr. Gray's classic work on the Rule against Perpetuities that this rule presently and always did require the vesting of estates within the prescribed period and did not concern itself with the question of alienability. This was in conflict with the statement of some of the greatest property lawyers and judges in England, numbering among them Sir Edward Sugden, that the Rule against Perpetuities concerns itself only with the time within which a future estate must be alienable."
 The appellants then proceed to argue (Bank's Op. Brief, p. 10) that "At any rate, whatever the 'true' rule had actually been, there seems to be no question that, up to the time of Professor Gray, the rule, at least, had not become definitely crystallized as a rule against remoteness in vesting and was, in fact, widely considered a rule against the suspension of the power of alienation."
 [2] Appellants next point out that our Civil Code, sections 715 and 716, as well as sections 770, 772 to 776 of that code, were copied in 1872 from the New York statutes that had first been adopted in 1828, and contend that our code sections and our constitutional provision must be interpreted in the light of the purposes of the New York legislators. While this is *337 undoubtedly true, the difficulty is in interpreting the intent of the New York legislators in 1828. In Chaplin, Suspension of the Power of Alienation (3d ed.), sections 2-4, that author takes the position that the New York statutes contain both the rules against restraints on alienation and against remoteness of vesting. He recognized that other authorities took a contrary view to the effect that the New York statutes were aimed only toward preventing the suspension of the power of alienation. In this respect he wrote ( 369, p. 281): "The view that there was no such general New York rule as ... Vesting, appears to have been based upon a supposition that at the time when the Revisers were framing, and the Legislature enacting, the sections of the Revised Statutes which deal with these matters, it was still generally thought that the common-law Rule against Perpetuities was confined to a requirement, by the end of a term prescribed by law, of absolute alienability, and that it was only later that it came to be recognized that that Rule was a rule against remoteness of vesting."
 This view, as Chaplin recognized, was not held by many others who contended that the only rule adopted in New York was the rule against restraints on alienation. (1 Columb. L.Rev. 165, 176; 13 Cornell Law Quarterly 167, 183; see, also, Hammerstein v. Equitable Trust Co., 156 App.Div. 644 [141 N.Y.S. 1065].) One of the leading cases in New York on this subject is Matter of Wilcox, 194 N.Y. 288 [87 N.E. 497], decided in 1909, and followed in Bishop v. Bishop, 257 N.Y. 40 [177 N.E. 302, 80 A.L.R. 1198]. That case held that both rules existed in New York by virtue of the New York statute from which section 715 of the Civil Code was copied, and that the period there set forth applied to both rules.
 Based on these arguments, appellants confidently assert that the constitutional provision first adopted in 1849, and readopted in 1879, must be interpreted as merely prohibiting "perpetuities," without defining the term and leaving to the Legislature the right to define the intended prohibition. This, it is argued, the Legislature did in 1872 by adopting only the rule against restraints on alienation found in sections 715 and 716 of the Civil Code. It is pointed out that 1849 was 37 years, and 1872 was 14 years, before Gray crystallized the remoteness rule in his work on the subject, and that the constitution and statutes were adopted at a time when it was generally understood that the rule was one against restraints on alienation. Gray, in discussing state constitutional provisions *338 similar to ours, stated that: "These provisions seem to be simply pieces of declamation without juristic value, at least on any question of remoteness." (Gray, Rule Against Perpetuities (4th ed.), 730, p. 669.) This view has been accepted by some legal writers in the field. In his article in 1 Southern California Law Review, before noted, Professor Burby states (p. 113):
 "It is to be noted that there is no mention of a rule of any kind in the constitution. Why attribute to the illusive word 'perpetuity' the connotation of a rule of any kind? It may well be said that the word was used in our constitution with the intention of prohibiting the unreasonable tying up of estates in real property, either by unreasonable restraints placed upon their alienation or by the unreasonable postponement of their vesting. ..."
 "If this be so, the constitutional prohibition would leave the Legislature free within certain limits to declare what is reasonable and what is unreasonable with a view to best subserve the interests of the people of the state under modern conditions of society. Unless a word appearing in the constitution had a well crystallized and established meaning at the time it was used, is it not within the power of the Legislature or the courts to subsequently attach a meaning to such a word conformable with reason? Or must we now listen to arguments pro and con as to the possible meaning with which a word was used almost a hundred years ago?" (See, also, 16 Cal.L.Rev. at p. 90.)
 Thus, the gist of appellants' argument is that either the constitutional provision was a mere general statement of policy and did not adopt any rule, or, if it adopted any rule, it was simply the rule against restraints on alienation. This, so it is contended, was the view of legislators in 1872 when sections 715 and 716 were adopted. In this connection appellants rely upon many California cases where the court apparently treated sections 715 and 716 as stating the California "rule against perpetuities." (Estate of Hinckley, 58 Cal. 457; In re Walkerly, 108 Cal. 627 [41 P. 772, 49 Am.St.Rep. 97]; Estate of Hendy, 118 Cal. 656 [50 P. 753]; Estate of Steele, 124 Cal. 533 [57 P. 564]; Blakeman v. Miller, 136 Cal. 138 [68 P. 587, 89 Am.St.Rep. 120]; Estate of Maltman, 195 Cal. 643 [234 P. 898]; see, also, 21 Cal.L.Rev. 15.)
 Based on these premises, which are argued at length, appellants conclude that the only restriction against "perpetuities" in this state is that found in sections 715 and 716, which *339 contain the rule against restraints on alienation, and that the only rule against remoteness of vesting is to be found in sections 770, 772 to 776 of the Civil Code. [fn. 1]
 These arguments are most interesting, but they are by no means conclusive on the issue. [3] There are other arguments which to us are more convincing and which lead to the conclusion that in this state both rules exist.
 Without in the least detracting from the merits of Gray's book, it is quite obvious that that author did not "create" or "establish" the rule against remoteness of vesting. Prior to 1886, confusion undoubtedly existed in this field, and Gray undoubtedly did a magnificent job in analyzing the development of the rule against remoteness. There would seem to be little doubt that he articulated and clarified that rule, but, as already pointed out, that rule had been established as early as 1685 in the Duke of Norfolk Case, and was pretty well developed in the common law by the middle of the Eighteenth Century. When our constitutional convention met in 1849 and adopted the provision prohibiting "perpetuities" in this state, it is reasonable to assume that they meant to prohibit the tying up of estates for long periods however accomplished. Moreover, in 1850, the Legislature made the rule of the common law the "rule of decision" in this state except where such common law was "repugnant" or "inconsistent" with the law of this state. At the very least, the constitutional provision determined that the rules of the common law aimed at preventing "perpetuities" were not "repugnant" or "inconsistent" with the policy of this state. It is quite reasonable to assume that the drafters in 1849 probably had in mind that the then generally accepted method of combatting "perpetuities" was by the rule against restraints on alienation, but it is equally reasonable to assume that they wanted to prevent the tying up of estates for long periods, however accomplished. The framers were careful not to adopt any specific "rule," but to provide that "perpetuities" were prohibited. Since one method to accomplish this result then known, but perhaps not fully understood, was to require estates to vest within lives in being and 21 years, it would seem to follow logically that the constitutional provision adopted both rules, implying that the Legislature could regulate the rules as the needs of the times might require. *340
 It is worth noting on this phase of the argument that the courts in several states where constitutional provisions similar to ours exist, have held that such constitutional provisions adopt the rule against remoteness of vesting. (Russell v. Jackson, 21 Tenn.App. 512 [113 S.W.2d 76]; City of Chattanooga v. Tennessee Electric Power Co., 172 Tenn. 524 [112 S.W.2d 385]; Anderson v. Menefee (Tex.Civ.App.), 174 S.W. 904; Laval v. Staffel, 64 Tex. 370.)
 We think that either by virtue of the constitutional provision or by virtue of the Statute of 1850, both the rule against restraints on alienation and the rule against remoteness of vesting were adopted in this state subject to the power of regulation by the Legislature. [4] Between 1849 and 1872 these two rules required estates to be alienable and to vest within lives in being and 21 years.
 [5] Now what happened in 1872 when the Legislature adopted sections 715 and 716 of the Civil Code? What was accomplished by such adoption? It would seem clear that, by language too clear to require interpretation, the Legislature was codifying only the rule against restraints on alienation, and had no intent in those sections to refer to the rule against perpetuities. The holding in Matter of Wilcox, supra, by the New York court that the comparable New York sections adopted both rules is simply contrary to the language used. The language of section 715 as originally adopted is: "The absolute power of alienation cannot be suspended, by any limitation or condition whatever, for a longer period than during the continuance of the lives of persons in being at the creation of the limitation or condition. ..." That language has no application at all to vesting--it is the suspension of the power of alienation that is the subject matter of the section. But the section did more than merely codify the existing law as to restraints on alienation. The common-law period as to such restraint was lives in being and 21 years. Section 715 limited and reduced that period to lives in being. It was not until 1917 that the present "or twenty-five years" alternative was added. [fn. 1] Thus, for reasons best known to the Legislature, *341 it determined to shorten the period during which property could be inalienable. But not a word was said in these sections about the rule against remoteness of vesting. That the Legislature had the rule against remoteness in mind, is shown by the adoption of sections 770, 772 to 776 of the Civil Code relating to the vesting of future estates upon certain specialized contingencies. But not a word was said about the general rule against perpetuities. Appellants argue that this indicates that the Legislature desired to adopt or codify only the rule against restraints on alienation. The effect of such an interpretation, if it be assumed that the constitutional provision is meaningless, would be to ascribe to the Legislature an intent to repudiate the rule against remoteness of vesting which was then a basic part of the common law. It would mean that the Legislature intended to permit estates to be tied up indefinitely so far as vesting was concerned, so long as they became alienable within the specified period. It is far more reasonable to imply that the Legislature had in mind inalienability of estates as the main evil to be met, and as to that rule determined to shorten the period, but, as to the rule against remoteness, determined that the common-law rule was satisfactory and decided that it need not be codified but should remain unimpaired as it existed at common law, and, as already held, as it existed in this state from 1849 to 1872. [fn. 1] Why the Legislature determined to have one period for the rule against restraints, and another period for the rule against remoteness, does not appear, and no logical reason occurs to us. It probably is most reasonable to assume that the Legislature was conscious of the evil of inalienability and simply forgot or overlooked the rule against remoteness. But whether the Legislature simply forgot that rule, or consciously believed it was leaving it unimpaired by not mentioning it, the result is the same. In either event, the rule against remoteness remained a part *342 of our law. To hold otherwise would be to hold that the Legislature repealed by implication the existing rule against remoteness, and repeals by implication are not favored.
 Of course, if it be held that the constitutional provision of 1849 adopted both rules, or at least adopted the rule against remoteness, subject to the implied power of the Legislature to regulate them or it, then it would necessarily follow that the Legislature had no power to repeal a constitutional rule, and that the rule against remoteness remained in our law unimpaired by the legislation of 1872. This seems to have been the view of most of our appellate courts where the problem has been discussed. By dicta in several cases, and by a direct holding in one case, our appellate courts have stated that the constitutional provision engrafted the common-law rule against remoteness into our law. One of the most important cases so holding is Estate of McCray, 204 Cal. 399 [268 P. 647]. There a trust was created for a flat period of 10 years, with no preceding period based upon lives in being. The District Court of Appeal (260 P. 940) held that the 1917 amendment to section 715 of the Civil Code adding the "or twenty-five years" to the lives in being allowance for the suspension of the power of alienation, was unconstitutional because it contravened the constitutional prohibition against "perpetuities." This was reversed by the Supreme Court. It held that the trust concerned vested interests and that, therefore, the common-law rule against perpetuities, i.e., against remoteness of vesting, was not involved. The constitutionality of section 715 was upheld. It is apparent, therefore, that the question as to whether the Constitution adopted the rule against remoteness of vesting was not involved. Nevertheless, the court, by way of dicta, discussed the problem. On page 405 it is stated: "Assuming that the provision of the Constitution which forbids, but does not define perpetuities has reference to the rule which had become crystallized under the English common law, that rule merely provides that 'all future estates' which may 'arise by way of executory devise, conditional limitation, or shifting and springing uses, must vest within a life or lives in being at the death of the testator, and twenty-one years; and in case the person in whom the estate or interest should then vest is en ventre sa mere, nine months more will be allowed; and all estates created as aforesaid, and so limited that they may not vest within that time, are void.' [Citing authorities.]" *343
 And at page 406 the Court said: "The rule against restraints on alienation has been, in some cases, confused with the rule against perpetuities; but the two rules, while having the same end in view, viz., that of preventing undue interference with the freedom of transfer of property, are of entirely different origin and application. The rule against perpetuities, engrafted upon our system by the Constitution, relates only to future interests in property, the vesting of which is to be postponed beyond the alloted time. The rule relating to restraints on alienation, on the other hand, is statutory in origin, and has reference to an undue prevention of the transfer of estates already vested. ..." (Italics added.)
 Thus, we find the Supreme Court stating, in no uncertain language (by dicta it is true), that the constitutional provision does engraft the rule against remoteness of vesting upon the law of this state.
 This case was followed by Estate of Harrison, 22 Cal.App.2d 28 [70 P.2d 522], where the court again concluded that the interests involved were vested, and for that reason it was held that "this trust does not violate the rule against perpetuities." (P. 35.) The Court, however, implied, at least by dicta, that the rule against perpetuities--i.e., against remoteness of vesting--existed in this state. The same assumption is implicit in Estate of Gump, 16 Cal.2d 535 [107 P.2d 17], where again the Court assumed that the rule against perpetuities was extant in this state. In that opinion, at page 547, the Court, in discussing the question of separability of valid trust provisions from invalid ones, stated: "We ... shall proceed, upon the premise that this particular provision would be repugnant to the constitutional and statutory prohibitions against perpetuities and restraints on alienation, to a discussion of the question of whether the inclusion of such invalid provision in the trust instrument necessarily invalidates the entire trust agreement."
 In Dallapi v. Campbell, 45 Cal.App.2d 541 [114 P.2d 646], we find an express holding to the effect that there is a rule against remoteness of vesting in this state. There it was held that the reservation by a grantor of realty of the right to designate, in the future, an oil and gas lessee of the property granted, was in violation of the rule against remoteness of vesting, because such lease might be executed beyond the period of lives in being plus 21 years. The Court expressly refused to decide whether the provision also violated the rule against restraints on alienation. At page 544 the court *344 declared: "The rule against perpetuities, as it existed under the common law, appears at this time to be an established rule of property law in this state." Estate of McCray, supra, is relied upon. After holding that the Court would not consider whether the reservation violates the rule against restraints on alienation, the Court stated (p. 545): "We do conclude, however, in view of the fact that the execution of an oil and gas lease constitutes the conveyance of an estate in real property, that the reservation of a power or a right to lease plaintiffs' property, unlimited as to the time of execution of such lease, was a violation of the rule against perpetuities, and therefore void and of no effect."
 On page 547 appears the following: "The rule against perpetuities was violated at the time of the execution of the deed to plaintiffs, because of the possibility that the future interest (oil and gas lease), might vest beyond the required period, as conformity to the rule does not permit speculation as to the vesting of such future interest within the period of lives of persons in being, plus twenty-one years. The mere possibility of the property interest vesting beyond the period, constitutes the violation of the rule. ..."
 Here is a direct holding that the rule against remoteness exists in this state, is well established, has become a rule of property, and that the period involved is lives in being plus 21 years.
 It is true that in a recent case the Supreme Court expressed some uncertainty on the point. (Estate of Micheletti, 24 Cal.2d 904 [151 P.2d 833].) The exact quotation appears on page 908 as follows: "Appellant contends that the interests created ... violate the rule against perpetuities and the prohibitions against restraints on alienation in the Civil Code. It is appellant's position that the rule against perpetuities is in force in this state by reason of article XX, section 9, of the California Constitution prohibiting perpetuities except for eleemosynary purposes and section 4468 of the Political Code, which makes the common law of England the rule of decision in the courts of this state insofar as it is consistent with the laws and Constitution of the state. There is considerable uncertainty as to the soundness of this position [citing Simes, Law of Future Interests and The Restatement], but it is unnecessary to determine that question in this case, for the executory interest ... must vest, if at all, within lives in being and are therefore not within the operation of the rule *345 against perpetuities, which applies solely to remoteness of vesting." (Italics added.)
 It will be noted that the court does not refer to any of the above-noted cases, nor does it consider the arguments above set forth. There is no holding, even by way of dicta, that the rule does not exist in this state--the Court merely expressed a doubt on the subject.
 Thus, it appears, that the case law in this state is in accord with the conclusions reached in this opinion.
 There is another factor proper to consider. On debatable issues, and in questionable cases, it is proper to consider the results that will flow from one holding or the other. Practical considerations should not be entirely forgotten. If we should hold that there is no rule against remoteness in this state it would mean that, as long as such estates are made alienable within lives in being or 25 years from the date of the creation of the interest, vesting could be postponed for periods far in excess of those allowed at common law. Thus, to that extent, the policy of the law to prevent the tying up of estates would be defeated. A most important rule of public policy existing at common law for over 250 years would be disregarded. A court should require the most convincing arguments before it should set aside the collective wisdom of the many judges contributing to the common law.
 But, says the attorney general, if it be assumed that the rule against remoteness exists, then the court should hold that the period prescribed in section 715 of the Civil Code--lives in being or 25 years--applies not only to the rule against restraints on alienation, but as well to the rule against remoteness, and that the common-law period--lives in being and 21 years--should be disregarded. A vigorous argument is made in support of this position, it being contended that no logical reason exists why there should be different periods for the two rules, and many practical considerations require the two periods to be identical. We agree with this appellant that there would seem to be no logical reason for having different periods for the two rules, and that practical considerations suggest that they be identical. [6] But these are not the questions. The law is frequently neither logical nor practical. Such arguments can only be considered when the issue is debatable. Here the Legislature has provided in section 715 for a period of lives in being or 25 years after which property must be alienable. The section clearly and unequivocally refers only to the rule against restraints on *346 alienation. To hold that it includes the rule against remoteness of vesting would be to write into the statute something that is not there. While a court may consider logic and practical considerations when there is room for interpretation, where the language is so clear that no reasonable mind can differ as to the meaning of the words used, the Court has no alternative but must enforce the statute as written. To hold otherwise would be to hold that this Court may legislate, which, of course, it cannot.
 [7] We conclude this phase of the discussion with the holding that in this state we have both the rule against restraints on alienation, with its statutory period of lives in being or 25 years, and the rule against remoteness of vesting, with its common-law period of lives in being and 21 years. While such a holding makes the work of the draftsman of wills a difficult one, such argument should be addressed to the Legislature and not to the courts.
 The next basic problem to consider is whether any one or more of these trusts violates either or both of the rules in question. The court found, and respondent argues, that certain of the trusts violate both rules. We are convinced that the rule against restraints on alienation was not violated by any of the provisions of the will. Most of the provisions of paragraph (c) of article V, above quoted, provide for the termination of the trust either upon the death of the daughter (a life in being), or within a period of 24 years from the death of the testator. Thus, the property will become alienable within lives in being or 25 years as provided in section 715. The only provision claimed by respondent to violate the provisions of section 715 is the last portion of the quoted paragraph which reads as follows: "further provided, the said trust shall also terminate, vest and be distributed as aforesaid, anything hereinbefore to the contrary notwithstanding (my said daughter, of course, being deceased) when the youngest living of her children has attained the age of twenty-five (25) years." There can be no doubt that, if this provision be read independently of the rest of the provisions of the paragraph, it would seem to violate section 715. It can be interpreted, as contended by respondent, and as apparently interpreted by the trial court, to mean that the trust, in any event, was to exist until the youngest of Dora's possible issue reached the age of 25. A child might be born to Dora after the death of the testator, and if Dora then died, such child, obviously, would not reach 25 within lives in being or 25 years *347 from the death of the testator. This, while a possible interpretation, is not the only interpretation, and, in our view, not the most reasonable interpretation. [8] The probate court interpreted this provision without the aid of extrinsic evidence. It follows that the interpretation of the clause is before us as a matter of law; that this court must interpret the provision for itself; and that the trial court's interpretation, even if possible or even reasonable, is not binding upon us. (Estate of Platt, 21 Cal.2d 343 [131 P.2d 825]; Brant v. California Dairies, Inc., 4 Cal.2d 128 [48 P.2d 13]; Moffatt v. Tight, 44 Cal.App.2d 643 [112 P.2d 910].)
 [9] The clause in question follows many provisions in the will relating to the distribution of income and the termination of the trust. These provisions are clear and precise, and disclose the testator's intent beyond question. He wanted this trust to terminate, if Dora survived him and had no issue, upon Dora's death. But, if Dora survived him and had issue living at the testator's death, then the trust was to continue for 24 years after the testator's death. If Dora predeceased him, but left issue, the trust was to terminate 24 years from the death of the testator. These provisions are most carefully drawn and were obviously drafted with section 715 in mind. They do not, of course, violate that section. Then follows the provision above quoted. When the prior provisions are considered, the most reasonable interpretation of the quoted clause is that the testator intended to effect a termination of the trust even before 24 years had elapsed after his death, in the event the youngest child of Dora reached the age of 25 during that 24-year period. The words "shall also terminate," and "anything hereinbefore to the contrary notwithstanding" suggest this interpretation. We think that this provision for termination when the youngest child of Dora reaches 25, could only apply to issue of Dora alive at the time of the testator's death, and the youngest of whom became 25 before the expiration of the 24-year period after such death. Thus interpreted, the questioned provision shortens the previously provided termination date--24 years after the testator's death--and does not extend the period beyond that permitted by section 715. We conclude, therefore, that the trust does no violence to the rule against restraints on alienation.
 [10] But the draftsman was not so fortunate in evading the rule against remoteness of vesting. An examination of paragraph (c) demonstrates that several of its provisions violate this rule. That is so because the trust provides that *348 Dora was to get the income for life, the trust to terminate upon her death if she had no issue. So far, the provision is valid. But then it provides that if Dora survived the testator but died within 24 years of the testator, and left issue, such child or children were to receive the income until that period of 24 years had elapsed, at which time the trust was to terminate and the remainder interests were to vest in possession. The provision for income to such possible issue does not violate the rule against perpetuities, but the provision for the distribution of the corpus does. Obviously, if Dora had no children at the death of the testator, but had a child or children within three years of that date, and then died, and such after-born children survived the 24-year period, the remainder interests might not vest within the period of Dora's life, plus 21 years. The same reasoning applies to the interests of the possible issue of the named German remaindermen. If any of these named remaindermen survived the testator but died within three years thereafter, leaving issue, obviously, since the interests of such issue might not vest (if Dora died leaving issue) until 24 years after the testator's death, this would be more than lives in being plus 21 years.
 These possibilities render the remainder bequests to the possible issue of Dora and to the issue or possible issue of the named German remaindermen void because in violation of the rule against remoteness of vesting. This is so even though Dora was 55 years of age at her father's death and was then a childless widow. The possibility of her having issue is extremely remote. [11] But on the issue of validity of a trust it is never presumed that a woman, no matter how aged, is incapable of bearing children. (Fletcher v. Los Angeles Trust etc. Bank, 182 Cal. 177 [187 P. 425].) [12] Moreover, it is not the "probability" of a violation of the rules against remoteness or restraints on alienation that brings such rules into operation, but only the bare "possibility" as such "possibility" exists at the date of the inception of the trust. (Estate of Gump, 16 Cal.2d 535 [107 P.2d 17]; Estate of Troy, 214 Cal. 53 [3 P.2d 930].) This being so, and it appearing that the interests of the possible issue of respondent and the issue or possible issue of the German remaindermen are contingent and conditional upon their survival of the period the trust will be in effect, and will not vest until such termination, and since there is a bare possibility that such termination might be extended beyond lives in being and 21 years, these remainders violate the rule in question. *349
 Respondent also contends, although the trial court did not so find, that several provisions of the trust violate sections 774 and 776 of the Civil Code. These sections provide: Section 774: "Successive estates for life cannot be limited, except to persons in being at the creation thereof, and all life estates subsequent to those of persons in being are void; and upon the death of those persons, the remainder, if valid in its creation, takes effect in the same manner as if no other life estate had been created." Section 776: "A contingent remainder cannot be created on a term of years, unless the nature of the contingency on which it is limited is such that the remainder must vest in interest during the continuance or at the termination of lives in being at the creation of such remainder." It is quite obvious that section 774 has not been violated because no successive life estates here exist. The possible interests of the possible issue of Dora are not "life estates," but estates for years--24 years after the testator's death or until the youngest child living at the testator's death reaches 25.
 It is quite likely that if section 776 was not impliedly amended by the 1917 amendment to section 715, and if section 776 applies to equitable interests and applies to trusts of the kind here involved, that certain of the provisions of the trust violate this section. This is so because there is a possibility that the remainders over to the issue of Dora and to the issue of the named German legatees, all of which remainders are contingent on survivability, might not vest until after a term of years and not during lives in being. We do not find it necessary to discuss this point, however, which involves some highly technical questions of interpretation, because, if the trust violates section 776, the violations are exactly the same as those already held void because of a violation of the rule against remoteness.
 This brings us to the last point urged by both appellants and that is, that, even though several provisions of the trust are held to be invalid, the trial court erred in invalidating the entire trust. It is argued that the invalid portions are separable from the valid portions and should be upheld. The respondent argues that, inasmuch as the trial court found that the provisions were not severable, its conclusions can be upset only if the trial court's finding is not supported by any reasonable interpretation of the will. [13] The finding of the trial court that "to uphold a portion of the trust in view of the provisions declared invalid above would defeat the intention of the testator" was based solely on the provisions of the will *350 and not upon any extrinsic evidence. For that reason the question of intent of the testator is before this court as a question of law and not of fact. (Estate of Platt, 21 Cal.2d 343 [131 P.2d 825]; Brant v. California Dairies, Inc., 4 Cal.2d 128 [48 P.2d 13]; Moffatt v. Tight, 44 Cal.App.2d 643 [112 P.2d 910].)
 Before discussing the rules applicable to the problem involved, the valid and invalid provisions of the trust should be set forth. These are:
 Income to respondent for life--valid.
 Income to issue, if any, of respondent for periods specified--valid.
 A share of the corpus upon termination to the issue, if any, of respondent--invalid.
 Shares in the corpus upon termination to five named German legatees--valid.
 Interests in the corpus upon termination in the issue of the five named German legatees if the named persons do not survive until termination--invalid.
 [14] As pointed out by Mr. Justice Traynor in Estate of Micheletti, 24 Cal.2d 904, 910 [151 P.2d 833], the purpose of the rule against restraints on alienation, and the same may be said about the purpose of the rule against remoteness of vesting, is not punitive. [15] For that reason testamentary dispositions that are valid are not necessarily invalidated by illegal limitations. In such cases the courts must undertake to ascertain the presumed intention of the testator had the invalidity of some of the provisions been called to his attention. In this state this rule has been codified. Section 101 of the Probate Code provides in part as follows: "A will is to be construed according to the intention of the testator. Where his intention can not have effect to its full extent, it must have effect as far as possible." The rule was stated as follows in Estate of Van Wyck, 185 Cal. 49, 62 [196 P. 50]: "The real question presented where a will contains both valid and invalid provisions is whether the two are so parts of a single plan or scheme or otherwise so dependent one upon the other that by avoiding the invalid provisions and allowing the valid to stand there will result a disposition of the estate so different from what the testator contemplated or so unreasonable that it must be presumed that the testator would not have made the valid provisions if he had been aware of the invalidity of the others." *351
 In Estate of Willey, 128 Cal. 1, 11 [60 P. 471], frequently referred to as the "leading case" on the subject, it is stated that: "... courts have firmly established the principle that valid trusts should not be disregarded because in the instrument creating them one particular invalid trust is declared, unless the latter is so inseparably blended with the others that it cannot be eliminated without destroying the main intent of the trustor, or working manifest injustice to other beneficiaries." (For other cases containing excellent statements of the rule, and where many cases are referred to, see Estate of Micheletti, 24 Cal.2d 904 [151 P.2d 833]; Estate of Gump, 16 Cal.2d 535 [107 P.2d 17]; Estate of Whitney, 176 Cal. 12 [167 P. 399].)
 The rule is clear and easy to state, but it is most difficult to apply. The best the court can do is to make an informed guess as to what the testator would have intended had he known that his expressed plan was partially invalid. The decisions in prior cases are at best but argumentative authorities when applied to the provisions of a particular will. This is so because it is seldom indeed that two trusts are identical. Even if the wording of the instruments should be similar, the fact situation, and possibly the intent of the testator, in each case might be different. [fn. 1] All that prior cases can do is to show what circumstances have been emphasized by the courts in upholding or refusing to uphold the valid provisions of a trust.
 Respondent places her main reliance on the Estate of Van Wyck, 185 Cal. 49 [196 P. 50], where the court held that the trust provisions were inseparable and that the entire trust must fail because certain provisions were invalid. In that case the trust provided for a life estate in the children of the testator, with remainders to the children's issue. The remainders were invalid, being in violation of section 715 of the Civil Code. Thus, as to these remainders, there was intestacy, and this portion of the estate would go to the heirs of the testator. The children, the life tenants, were also the heirs. Thus, if the valid provisions as to the life estates were upheld, the only effect would be to forestall the children's enjoyment of the complete interest in the trust property. The court properly held the entire trust void so that fee interests would *352 vest at once in the children. In so holding the court aptly commented (p. 63): "The trust under such circumstances would accomplish nothing and would be practically futile." Other cases where the trust provisions were held not severable are Estate of Maltman, 195 Cal. 643 [234 P. 898]; Estate of Whitney, 176 Cal. 12 [167 P. 399].
 The appellants place considerable emphasis on Estate of Troy, 214 Cal. 53 [3 P.2d 930], where valid and invalid provisions of a trust were held severable, and the valid provisions upheld. In that case the trust provisions were somewhat complicated. The will created a trust and provided: (a) Income to the wife for life; (b) on her death, or the testator's death if she did not survive him, to the testator's children then living in equal shares, issue of deceased children to take by right of representation; (c) any child, or issue of deceased child, who had reached the age of 21 at that time to take his equal share free of trust; (d) to retain the shares not distributed above and to use the income for the maintenance (p. 55) "of each of such children or the issue of any child of mine then deceased until such child or all of the issue of any child of mine then deceased shall reach the age of 21," at which time the child or issue would take his share free of trust; (e) if any child survived the testator and his wife but failed to reach 21 then his share to go to his issue surviving; and if there are no issue surviving, then the share to go in equal shares to the other children then living or then deceased leaving issue, such issue to take by right of representation; (f) if no children, or issue of children survived the testator and his wife, then to pay to David Howie, if he be living, two-thirds of the trust property free from trust, and to pay to Dartmouth College the remaining one-third of the trust property, and if Howie not be living then all to go to Dartmouth College free from trust.
 The court held that paragraph (d) of the trust violated sections 715 and 716 of the Civil Code inasmuch as it permitted the creation of trusts for the minority of grandchildren who could be born after the testator's death. The court held, however, that the trust for the life of the widow (a), and the contingent remainders in paragraphs (c), (e) and (f) of the instrument were separable and, hence, valid.
 In so holding the court laid down the general rules of construction above set forth, analyzed the terms of trust, emphasized what factors should be considered in determining the presumed intent of the testator, declared that the *353 enforcing of the valid provisions of the will would promote rather than defeat the main intention of the testator, and then stated (p. 65): "Our conclusion does not result in a disposition of the estate so different from what the testator contemplated nor so unreasonable that it must be presumed that the testator would not have made the valid provisions had he been aware of the invalidity of the others; it does not work injustice among the beneficiaries, nor defeat the dominant scheme and purpose of the testator in the disposition of his property; nor does it cause any important practical change in the testator's general scheme or result in any possibility that the property will go to others than those he intended; but, on the contrary, those whom the testator intended should benefit and whom he cherished will take by the plan which he devised."
 A few of the other cases where valid provisions have been held severable are Estate of Micheletti, 24 Cal.2d 904 [151 P.2d 833]; Estate of Gump, 16 Cal.2d 535 [107 P.2d 17]; Nellis v. Rickard, 133 Cal. 617 [66 P. 32, 85 Am.St.Rep. 227]; Estate of Willey, 128 Cal. 1 [60 P. 471]; Estate of Pichoir, 139 Cal. 682 [73 P. 606]; Sacramento Bank v. Montgomery, 146 Cal. 745 [81 P. 138].
 We turn now to the provisions of the instant trust to see what provisions may be presumed to have been important to the testator and what provisions may be presumed to have been incidental. [16] In this consideration it must be remembered that in deciding whether a testator would have preferred severability to entire invalidity, this court is entitled to consider what actually has occurred and is not bound to give consideration to what might have occurred. The rule is thus stated in Estate of Gump, 16 Cal.2d 535, 548 [107 P.2d 17], as follows: "It has also been held that in determining whether a case is a proper one for the application of the rule which permits a severance of invalid trust provisions in order to sustain those which are valid, it is not only permissible but proper to examine and evaluate actual occurrences." (See, also, Estate of Troy, 214 Cal. 53 [3 P.2d 930].)
 [17] This rule becomes of pivotal importance in this case because one of the interests here held invalid is the remainder interest in the corpus bequeathed to possible issue of respondent, that is, possible grandchildren of the testator. Normally, it would be presumed that where the testator leaves a life *354 estate to his children with remainders to his grandchildren, it was a basic part of his plan that the grandchildren should receive the remainders. But here not only were there no living grandchildren, but the possibility of ever having any was extremely remote. At the time the will was executed the respondent was a childless widow of 50. At the time of the testator's death respondent was 55 and still childless. It cannot be seriously thought that, under such circumstances, it was the fundamental and primary intent of the testator to provide for possible children of respondent. [fn. 1] With such a slim possibility of ever having grandchildren it would be a forced construction indeed to hold that the testator would have intended all the gifts to named remaindermen to fail if the gifts to these possible, but improbable, grandchildren were invalid.
 [18] It seems equally clear that the testator would not have intended the gifts to the five named German remaindermen to fail simply because the issue of such named remaindermen cannot take. Three of the five German remaindermen named in the will are relatives of the testator--a brother, a nephew and a sister-in-law. The other two were apparently friends and named in the will. Each of these is to get a share of the corpus if they survive respondent or the 24-year period set forth in the will. It was obviously an important part of the scheme of distribution that those named persons should ultimately receive a portion of the estate, because, even if respondent had issue, the corpus was to be divided between such issue and these five named persons.
 [19] There are other factors to be considered. This testator left a substantial estate. The trust set up by the will provides that the total income from the trust shall be payable to respondent, the daughter, for life. No situation is provided by which the life tenant was ever to receive any portion of the corpus. Spendthrift provisions are contained in the will. For reasons best known to the testator it is clear *355 that he wanted to assure his daughter of an income for life, but did not want her to have control of the corpus of the trust estate. This was obviously one of his main intents and will be carried out if the provisions are held to be severable.
 Then the testator provided for the slim possibility that his daughter might have issue. The provisions giving contingent remainders in the corpus to such issue are invalid. As already pointed out, the intent to care for such issue must be held to have been of only minor importance to the testator.
 Then the testator provided for the five named German remaindermen. As already pointed out, the desire to care for these individuals clearly appears in the will and must be held to have been one of the testator's primary concerns. To hold the will invalid in its entirety will defeat this intent of the testator. The only other interests that are invalid are those given to the issue of the named remaindermen if their parents are not alive at the termination of the trust. It can hardly be assumed that the testator would have desired the gifts to the named persons to be invalidated simply because the issue of such remaindermen cannot take.
 Thus it will be seen that to uphold the valid provisions of this trust will result in carrying out the main desires of the testator, while to hold that the provisions are not severable will defeat the main intentions of the testator. Under such circumstances, the valid provisions heretofore enumerated should be held to be severable from the enumerated invalid provisions.
 The decree appealed from is reversed.
 Ward, J., and Bray, J., concurred.
 "1. During the continuance of the lives of persons in being at the creation of the limitation or condition; or"
 "2. For a period not to exceed twenty-five years from the time of the creation of the suspension."
 Section 716: "Future interests void, which suspend power of alienation. Every future interest is void in its creation which, by any possibility, may suspend the absolute power of alienation for a longer period than is prescribed in this chapter. Such power of alienation is suspended when there are no persons in being by whom an absolute interest in possession can be conveyed."
NOTES
[fn. 1] 1. That section reads: "No perpetuities shall be allowed except for eleemosynary purposes." It also appeared in the 1849 Constitution, Article XI, section 16.
[fn. 2] 2. That section reads: "The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, is the rule of decision in all the courts of this state." Although this section was not adopted until 1872, it was based upon a similar statute first adopted April 13, 1850. (Compiled Laws of California, 1850-1853, ch. XLI, p. 186.)
[fn. 1] 1. All of these sections relate to the vesting of future estates upon special contingencies.
[fn. 1] 1. The sections as then amended, and as they now read, provide: Section 715: "Restraints upon alienation. Except in the single case mentioned in section seven hundred seventy-two, the absolute power of alienation can not be suspended, by any limitation or condition whatever, for a longer period than as follows:
[fn. 1] 1. It must be remembered that the same Legislature in 1872 adopted section 4468 of the Political Code reaffirming the statute of 1850 making the common law, except where repugnant or inconsistent with our law, the rule of decision in this state.
[fn. 1] 1. Thus, in the present case, if respondent had been a married woman of 20 when the will was executed, the testator's intent as to the importance of a provision for her issue might well be different than it would where, as here, she was a childless widow, aged 50.
[fn. 1] 1. It is almost a demonstrable fact that respondent will not now have issue. In an article entitled "Perpetuities in a Nutshell," by Leach in 51 Harvard Law Review 638, at page 643, in footnote 12, the author states that: "... we now have records of the U.S. Department of Commerce showing that in over twenty million births between 1923 and 1932 none was to a woman over 55 and .0001% were to women over 50." The World Almanac of 1948, page 445, relying on the National Office of Vital Statistics as its authority, states that of the 2,735,456 births in the United States in 1945, only 161 were to mothers between the ages of 50 and 54. No figures at all are given on births to women over 54. (See, also, 2 Encyclopedia of Social Sciences, 569.)