[Civ. No. 19975.   Second Dist., Div. One.   May 17, 1954.]

VICTORY OIL COMPANY (a Corporation), Plaintiff and Respondent, v. THE HANCOCK OIL COMPANY (a Corporation) et al., Defendants and Respondents; PAUL F. McKENZIE et al., Appellants.

Ball, Hunt & Hart, M. E. Lewis, Jr., and Clark Heggeness for Appellants.

McCutchen, Black, Harnagel & Green, Harold A. Black, Philip K. Verleger, Clock, Waestman & Clock, John G. Clock, Eugene Tincher, John W. Doran and Desmond & Desmond for Respondents.

MOSK, J. pro tem.*—Certain cross-defendants and one cross-complainant appeal from an adverse judgment quieting title to real property and granting declaratory relief in this case tried on stipulated facts plus the testimony of two expert witnesses.

Hereford Berry and Minnie F. Berry deeded a parcel of real property to J. W. Tucker on March 18, 1922, "excepting therefrom and reserving to the grantors and their successors in interest all oil, gas, hydrocarbons and other minerals on or under the said described lands . . . provided, however that the said grantees shall be entitled to one-half ($\frac{1}{2}$) of all net royalty, rental, or profits received by said grantors under any lease or contract which the said grantors may grant or enter into with any person, firm or corporation for the development of said lands. . . ."

All of the parties to this lawsuit claim their rights through either the grantors or the grantee.

The deed further provided that "in the event that oil, gas, hydrocarbons or other minerals shall not be found in paying quantities in or upon said described land within five (5) years from date of this agreement, all rights of said grantors in said land shall cease and terminate and the grantee and his successors in interest shall thereupon become vested with absolute title. . . ."

In the event oil, gas, hydrocarbons or other minerals were found within the five-year period from the date of execution of the deed then the instrument provided "the rights of said grantors in said lands as herein divided shall continue for a period of twenty (20) years, and so long thereafter as oil, gas or other minerals may or shall be produced therefrom in paying quantities."

On December 19, 1925, Hereford Berry, as lessor, entered into an oil and gas lease with the Hancock Refining Company, a corporation, and others, as lessees. Through a succession of assignments, not material here, the Hancock Oil Company,

---

*Assigned by Chairman of Judicial Council.

a corporation (hereinafter called Hancock), and the heirs and devisees of Louise E. Dabney, deceased, have succeeded to the entire leasehold interest of the original lessees under the Berry lease.

The original lessor, Hereford Berry, died in 1946, leaving his interest in the lease to Frances M. Hoffman and Hereford Berry, Jr., an undivided two-thirds and one-third, respectively.

Pursuant to the lease, three oil wells were drilled in the leasehold property and by December, 1926, were productive in paying quantities. This was within the five-year period. All three wells continued to be productive for nearly two decades but were ultimately abandoned on May 20, 1946.

On January 5, 1931, a fourth well, known as Berry No. 4, was completed and became productive in paying quantities. The surface location of this well was upon the leasehold property but unintentionally it was slant drilled so that its producing interval was approximately 100 feet beyond the exterior boundaries of the Berry leasehold. The producing interval is defined as that portion of an oil well through which oil is taken into the well, thereupon to be raised by mechanical means to the mouth of the well at the surface.

It was conceded in the stipulation of facts, and additionally testified to by both expert witnesses, John O. Richardson for the cross-complainants and A. A. Carrey for the cross-defendants, that in 1922 there was no known way of ascertaining the subsurface location of an oil well, and no way of controlling the subsurface direction of an oil well, that not until the last 20 years have there been in common use underground survey instruments and electric logs to ascertain underground strata.

The trial court found, and there was no evidence to the contrary, that Berry No. 4 was not intentionally drilled outside of the exterior boundaries of the leasehold property as the boundaries are projected from the surface vertically downward.

Out of production of the four wells appropriate royalties were paid to the appellants herein, it being stipulated in open court, however, that none of them was informed or aware of the fact that the producing interval of Berry No. 4 was located off the property described in the Berry Lease. It was further stipulated that none of the parties tendered back any of the royalties previously received, although all sums have been impounded since August, 1951.

The Victory Oil Company originally brought this suit in simple quiet title form, alleging fee title to the real property involved herein. Thereafter, all of the parties involved in this appeal filed answers and cross-complaints, except appellant Marjory R. Clarke, who is a cross-complainant only. The Victory Oil Company later sought to dismiss its action, and although dismissal was denied for the reason that affirmative relief was sought in the various cross-complaints, it did not participate further in the proceedings.

At the trial John R. Richardson, a petroleum engineer for the Hancock Oil Company, testified that despite the location of the producing interval Berry No. 4 drains oil from the area beneath the Berry Lease. He expressed the opinion that if Berry No. 4 had bottomed underneath its surface location at the time it was drilled it would have been comparable to the existing well. A. A. Carrey, a consulting geologist who had been the engineer in charge for Hancock when Berry No. 4 was drilled, testified that he could not say with any degree of conviction whether a vertically drilled well would have been productive. He indicated some fear that it would have been too close to an existing fault to be a good producer, or a producer as profuse as Berry No. 4. He conceded there was no question that the existing well drained oil from the area directly beneath the Berry property, for the producing interval of a well draws equally from all sides "like a concentric circle."

The trial court found that by reason of the fact at the time the deed was written there was no known way to ascertain the subsurface location of a well, the parties intended that there be a well upon the surface of the land producing oil, gas or other hydrocarbons. It found that the Berry mineral rights continue to exist and that the lease was and is valid and in full force and effect.

From this adverse conclusion Paul F. McKenzie, Elenore McKenzie and John M. Clarke, cross-complainants and cross-defendants in certain pleadings, and Marjory R. Clarke, cross-complainant, have appealed.

The trial court found that the provision of the deed to Tucker continuing the interest of the grantors for the period of 20 years "and so long thereafter as oil, gas or other minerals may or shall be produced" violates the rule against perpetuities. Appellant confronts us at the outset of this appeal with the contention that until 1951, California had no rule against perpetuities and that by legislative action

in 1951 the mineral interest created by the deed was specifically validated.

Article XX, section 9 of the California Constitution, provides that ''No perpetuities shall be allowed except for eleemosynary purposes.'' That constitutional provision, read together with section 4468 of the Political Code making the common law, except in certain cases, the rule of decision in this state, has provided the basis for a commonly accepted belief that California always has had a common law rule against perpetuities.

Early cases assume, both in dictum and in decision, that the constitutional provision against perpetuities was self-executing. In the absence of any legislation ''the courts of this State would go to the common law definitions to ascertain the meaning of the expression 'no perpetuities shall be allowed,' as used in the Constitution.'' (*Estate of Hinckley,* 58 Cal. 457, 472.) *Estate of McCray,* 204 Cal. 399, at page 406 [268 P. 647], speaks of ''the rule against perpetuities, engrafted upon our system by the constitution, . . .'' And in *Dallapi* v. *Campbell,* 45 Cal.App.2d 541, 544 [114 P.2d 646], it was held that ''the rule against perpetuities, as it existed under the common law, appears at this time to be an established rule of property of law in this state.'' That court also quoted with approval the language of *McCray* to the effect that the rule against perpetuities is engrafted upon our system by the Constitution.

Nevertheless, throughout the years a number of text writers expressed some academic doubts as to the existence of a rule against perpetuities in California. (Gray, *The Rule Against Perpetuities* (4th ed.), pp. 692-693; The American Law Institute, *Rest. of Prop.,* p. 2746; 1 So.Cal.L.Rev.107; 16 Cal.L. Rev. 81; 9 Cal.L.Rev. 447; 1 Cal.L.Rev. 305.)

This doubt was given additional substance in *Estate of Micheletti,* 24 Cal.2d 904, 908 [151 P.2d 833], in which Mr. Justice Traynor, speaking for a unanimous court, stated that, ''It is appellant's position that the rule against perpetuities is in force in this state by reason of article XX, section 9, of the California Constitution prohibiting perpetuities except for eleemosynary purposes and section 4468 of the Political Code, which makes the common law of England the rule of decision in the courts of this state insofar as it is consistent with the laws and Constitution of the state. There is considerable uncertainty as to the soundness of this position (see 2 Simes, *Law of Future Interest* [1936], § 572, p. 473; *Rest.,*

*Property* [Group No. 1], Proposed Final Draft No. 5 [1944], pp. 109-110), . . ." It must be noted, however, that this was mere dictum, for the court added that, ". . . it is unnecessary to determine that question in this case, . . ."

*Micheletti* was decided in 1944. In 1948 a direct attack upon the existence of a rule against perpetuities in California was vigorously asserted in *Estate of Sahlender*, 89 Cal.App.2d 329 [201 P.2d 69]. Taking cognizance of the doubt expressed in *Micheletti*, the court in *Sahlender* thoroughly reviewed the state of the law and concluded that by virtue of the constitutional provision and the 1850 statute making the rule of the common law the rule of decision in this state, California has always had the rule against perpetuities. *Sahlender* was decided by a unanimous court, and the Supreme Court denied a hearing on February 25, 1949. This being after *Micheletti*, it must be assumed that the Supreme Court thereby approved the unequivocal decision in *Sahlender*.

But, maintains the appellant herein, the Legislature spoke on this subject in 1951, and its enactment at that time compels a conclusion, prior judicial determination to the contrary notwithstanding, that there was no rule against perpetuities in California prior to 1951. There being no cases since the Legislature last spoke on that subject, we must give consideration to the effect of the 1951 statute.

At that time the Legislature adopted section 715.2 of the Civil Code, providing as follows:

"[Vesting of interest in property: Rule against perpetuities.] No interest in real or personal property shall be good unless it must vest, if at all, not later than 21 years after some life in being at the creation of the interest and any period of gestation involved in the situation to which the limitation applies. The lives selected to govern the time of vesting must not be so numerous or so situated that evidence of their deaths is likely to be unreasonably difficult to obtain. It is intended by the enactment of this section to make effective in this State the American common-law rule against perpetuities."

At the same time the Legislature adopted section 8 of chapter 1463, Statutes of 1951, further providing:

"This act shall not invalidate any part of any will or other instrument executed prior to the effective date of this act and any such part which would have been valid prior to said effective date shall be valid irrespective of the provisions of this act. The republication of a will executed prior to

the effective date of this act by a codicil executed after said date shall not constitute execution of the will after said date within the meaning of this section."

From section 8 the appellant contends there is a compelling inference that the Legislature was not merely codifying a common-law rule but was asserting a mandate that no wills, leases, deeds or other documents executed prior to 1951 were to be invalidated because of failure to meet the limitations imposed by the rule against perpetuities.

With this hypothesis we cannot agree. That "*this act* shall not invalidate any part of any will or other instrument executed prior" to its effective date cannot be construed to preclude an instrument being declared otherwise invalid for running afoul of the Constitution, other acts, or judicial construction of the common law.

The Legislature must have so intended, for in the next clause of section 8, it provided that "any such part *which would have been valid prior to said effective date* shall be valid irrespective of the provisions of this act."

Therefore we must ascertain whether an instrument "would have been valid prior to" 1951, in order to determine its immunity under section 8.

█ The validity of any instrument is determined by laws, both written and unwritten. A written law is that which is promulgated in writing and of which a record is in existence. (Code Civ. Proc., § 1896.) Unwritten law is the law not promulgated and recorded but which is, nevertheless, observed and administered in the courts of the country. It has no certain repository, but is collected from the reports of the decisions of the courts, and the treatises of learned men. (Code Civ. Proc., § 1899.)

█ In this last body of law may be included judicial interpretation of the common law. █ In this state the common law, except so far as it is inapplicable to our conditions, or has been modified by statute, still remains in force. (*Estate of Elizalde*, 182 Cal. 427, 432 [188 P. 560].) █ The code establishes the law respecting the subjects to which it relates but where the code is silent the common law governs. (*Estate of Apple*, 66 Cal. 432, 434 [6 P. 7].)

█ It is true that decisions written on a subject prior to the enactment of a statutory provision thereon are not necessarily controlling. (*Harlie R. Norris Co., Ltd.* v. *Lovett*, 123 Cal.App. 640 [12 P.2d 141].) However, the necessity for adherence to the doctrine of *stare decisis* was very early

decided in California in the landmark case of *Hart* v. *Burnett*, 15 Cal. 530, 601.

In deference thereto, we perforce return to the most recent decision immediately prior to 1951, *Estate of Sahlender*, *supra*. And once again the conclusion is inescapable that this instrument would not have been valid prior to 1951 because of its failure to conform to the rule against perpetuities.

For more than 250 years at common law, and since 1849 in California, the rule against perpetuities has been generally acknowledged doctrine. Its reduction to formal legislative enactment in 1951 and inclusion in the code suggests continued acceptance rather than rejection as public policy at this late date.

Finally, on this subject, it is contended by appellant that there would be no purpose for section 8 of the Act of 1951 were it not the intention of the Legislature to validate all documents executed prior thereto that might otherwise be in conflict with the newly enacted legislative rule against perpetuities. This is an unwarranted assumption, for the act comprising chapter 1463, 1951 Statutes, did more than merely adopt in statutory form the rule against perpetuities. The same act also reduced the permissible period for restraints upon alienation from 25 years to 21 years after some life in being. A comparison of former Civil Code section 715, enacted 1872, amended in 1917 and repealed in 1951, with the present section 715.1, indicates that many documents might be invalidated were it not for section 8.

In order that its distinction from the rule against restraints upon alienation may be more clearly understood, the rule against perpetuities is sometimes known as the rule against remoteness of vesting. That designation makes it apparent that a vested interest is not subject to the rule. Appellant maintains the Tucker interest was at all times vested.

A future interest is vested when there is a person in being who would have a right, defeasible or indefeasible, to the immediate possession of the property, upon the ceasing of the intermediate or precedent interest. (Civ. Code, § 694.) A future interest is contingent, whilst the person in whom, or the event upon which, it is limited to take effect remains uncertain. (Civ. Code, § 695.)

It is true that the law favors the vesting of interests and will presume every interest to vest unless a contrary intention is clearly manifested. (*Williams* v. *Williams*, 73 Cal. 99 [14 P. 394].) It does appear to be clearly mani-

fest in this instance, however, that the termination of production of oil and gas is a dubious, uncertain event. ██ As stated in *County of Los Angeles* v. *Winans*, 13 Cal.App. 234, 243 [109 P. 640], ". . . wherever the preceding estate is limited so as to determine only on an event which is uncertain, and may never happen; or wherever the remainder is limited to a person not *in esse* or not ascertained; or wherever it is limited so as to require the concurrence of some dubious uncertain event, independent of the determination of the preceding estate and duration of the estate limited in remainder, to give it a capacity of taking effect, then the remainder is contingent."

The rule is also stated in, and frequently quoted from *Estate of Washburn*, 11 Cal.App. 735, 740, 741 [106 P. 415]:

"The existence of a contingency, irrespective of the duration of the remainder, on which contingency possession or enjoyment depends, is the fundamental characteristic of a contingent remainder and forms a true, tangible and practical criterion by which the contingent character of a remainder is limited on an uncertain event, that is, an event which may never happen, or an event which may not happen till after the determination of the particular estate, though it is certain to happen at some time, or when the remainder is limited to a person not in being or not ascertained. (24 Am. & Eng. Ency. of Law, p. 400.)"

Though semantics are not controlling, the case of *In re De Vries*, 17 Cal.App. 184, 196 [119 P. 109], suggests that the adverbs "when," "then," "after," "until," and "from" are construed to relate merely to the time of the enjoyment of the estate and not the time of vesting in interest. Words such as "if," "in the event," and similar others are construed to denote contingency. The instant conveyance uses the expression "in the event" in one clause and "if" in the other. ██ By the foregoing tests, it appears that the Tucker interest was not vested, but was dependent upon a dubious, uncertain future event and was therefore a contingent interest.

In furthering the assertion that this is a vested interest and thus beyond the reach of the rule against perpetuities, appellants urge that the pertinent *habendum* clause of the conveyance does not create an exception, but is a reservation of the *profit a prendre*, and a conveyance of the *profit a prendre* from grantee Tucker to grantor Berry by way of re-

grant. This, of course, would be purely a fictional regrant, since no such instrument was executed or recorded.

There is some authority in California in support of this theory. (*Aden* v. *City of Vallejo,* 139 Cal. 165, 168 [72 P. 905]; *Wagner* v. *Hanna,* 38 Cal. 111, 116 [99 Am.Dec. 354]; *Painter* v. *Pasadena Land & Water Co.,* 91 Cal. 74, 81 [27 P. 539].)

The regrant concept, tenuous at best, was devised to obliterate the distinction between corporeal and incorporeal interests with regard to required words of inheritance. (*Painter* v. *Pasadena Land & Water Co., supra.*) Once the "great changes which have occurred in the political and business relations of life, however, have done away with the reason for such a rule," so stated Painter in 1891, the inheritable disability of *profit a prendre* was eliminated, and with it went any further usefulness of the fictional regrant.

▇▇▇ There is a distinction between a reservation and an exception. A reservation creates some right or privilege for the benefit of the grantor in the land described and withholds it from the operation of the grant. By a reservation the grantor reserves to himself something which did not exist as an independent right before the grant, but which is thereby newly created. An exception, on the other hand, is a clause in a deed which withdraws from its operation some part of the estate granted. (*Stone* v. *Stone,* 141 Iowa 438 [119 N.W. 712, 714, 18 Ann.Cas. 797, 20 L.R.A.N.S. 221].)

Only a cursory examination of cases is necessary to indicate the terms reservation and exception often are used interchangeably and that their distinction is technical, "slight and shadowy." (*Van Slyke* v. *Arrowhead etc. Power Co.,* 155 Cal. 675, 679 [102 P. 816].)

It is clear that the phraseology employed in the instrument in question is not controlling nor determinative of the question of whether a reservation or exception is created. (*Coon* v. *Sonoma Magnesite Co.,* 182 Cal. 597 [189 P. 271].) In the instant conveyance both "excepting" and "reserving" were used.

There are no California cases discussing whether retention of the right to extract oil is a reservation or an exception. In many jurisdictions the terms are used indiscriminately. (Summers *Oil and Gas,* volume 1A, section 133; *Lovelace* v. *Southwestern Petroleum Co.,* 267 F. 513; *Rich* v. *Doneghey,* 71 Okla. 204 [177 P. 86, 3 A.L.R. 352].) In other jurisdictions, retention of the right to extract oil has been held to be an ex-

ception. (*Klein* v. *Humble Oil & Ref. Co.*, (Tex.Civ.App.)
67 S.W.2d 911; *Arnett* v. *Elkhorn Coal Corp.*, 191 Ky. 706
[231 S.W. 219]; *Allen* v. *Henson*, 186 Ky. 201 [217 S.W.
120].)

The trial court found the instant conveyance to be an exception and that determination appears sound. However, even if this were held to be a reservation the rule of *Dallapi* v. *Campbell*, 45 Cal.App.2d 541, 545 [114 P.2d 646], would be persuasive, the court there finding a reservation of a *profit a prendre* to be a violation of the rule against perpetuities, and therefore void and of no effect. (See *Pimentel* v. *Hall-Baker Co.*, 32 Cal.App.2d 697 [90 P.2d 588]; *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871].) To the same effect is *Dabney* v. *Edwards*, 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822], which holds that a *profit a prendre*, an incorporeal hereditament, is an estate in real property. (*Munsey* v. *Mills & Garitty*, 115 Tex. 469 [283 S.W. 754, 759].) There is no convincing authority holding this estate in real property, unlike others, to be exempt from the rule against perpetuities.

Finally we come to the contention of appellants that production from Berry No. 4, being bottomed outside the property, does not fulfill the duration clause of the deed—"and so long thereafter as oil, gas, hydrocarbons and other minerals may or shall be produced therefrom in paying quantities."

The severance of oil from the land of another with felonious intent is prohibited. (*People* v. *Brunwin*, 2 Cal. App.2d 287 [37 P.2d 1072].) Generally speaking, a theft, though prosecution therefor may be barred by the statute of limitations, is no less a theft.

However, the circumstances in this case do not justify the aggrieved demeanor of appellants. For, as nearly as possible, we must place ourselves in the position of the parties at the time of the execution of the instrument involved. (*Miller* v. *Grunsky*, 141 Cal. 441, 453 [66 P. 858, 75 P. 48]; *Walsh* v. *Hill*, 38 Cal. 481, 487; *Brannan* v. *Mesick*, 10 Cal. 95, 106; *Marlin* v. *Robinson*, 123 Cal.App. 373, 375 [11 P.2d 70].)

In so doing, we find the parties entered into this instrument at a time when techniques for the discovery of the subsurface location of an oil well and its producing interval were yet to be developed. From the visible surface a well could be drilled, but its course and terminal were unknown mysteries, beyond the ken of man and science.

Thus the conclusion seems inescapable that the parties contemplated merely a well *surfaced* on the land in question,

producing oil in paying quantities. They could not have intended proscribing the subsurface course of the well, nor restricting removal of oil to within the four vertical boundaries of their property. To ascribe such intention is to suggest a clairvoyant knowledge of future technological advance.

Berry No. 4 was drilled in 1930 to a depth of more than 6,000 feet and deviated about 100 feet. Within a very few years thereafter, techniques for ascertaining and controlling a hole were developed, survey methods first, directional drilling methods later. No doubt thousands of inadvertent trespasses were revealed, for in 1935 the Legislature found it necessary to declare public policy at some length:

"Sec. 2. *Declaration of policy.* It is declared that it is common knowledge that there are thousands of oil and gas wells, varying age, within this state, which are not wholly within land owned, leased or otherwise controlled by the past or present owner or operator of the well; that many such wells were drilled without intent so to invade the land of another; that until recent years there was no way for determining even approximately the subsurface location of the well; that now it is difficult and expensive to determine by any method of subsurface directional survey even the approximate subsurface location of the well, and in cases of many producing wells, to make such survey may jeopardize the well and its ability to produce; that in many instances wells could not have been drilled and hereafter cannot be drilled without some material deviation from the vertical; that the producing of most and perhaps all such wells has been and will be of great public benefit; that the possibility of commencement of large numbers of said causes of action, excepting where the acts hereafter are committed knowingly and intentionally as aforesaid, has brought great and undesirable confusion and uncertainty in the oil industry, may cause terrific financial distress and unemployment, and may cause the premature abandonment and prevent the full use of many wells, all contrary to true conservation of oil and gas; that the people have a public interest in removing said hazard and precluding said confusion, uncertainty, distress and unemployment, without doing violence to private rights; that vigilant persons can protect their rights within said 180 days; that public policy and the welfare of the people require the reduction of the time for commencement of such causes of action and that said 180 days is deemed reasonable; that

public policy and the welfare of the people require the measure of damages to be as above provided, in all cases where the invasion of the rights of another person has heretofore been or shall hereafter be by reason of any honest mistake of law or fact, either by the departure of a well from the vertical or otherwise.'' (Code Civ. Proc., § 349¾; Stats. 1935, p. 2285.)

In 1946, when the original three wells were abandoned, and only Berry No. 4 remained, any action for conversion by the owners of adjacent property then would have been barred by Code of Civil Procedure, section 349¾ for 11 years. The foregoing declaration of public policy had the effect of rendering legal and proper the continued withdrawal of oil from wells that deviated from the vertical. In fact, said the Legislature, it was of great public benefit.

Here the appellants have been receiving royalties from Berry No. 4 up to the commencement of this suit with no audible remonstration. It becomes difficult to understand by what rationale they now assume a position that could have been maintained only by adjacent landowners within 180 days after adoption of Code of Civil Procedure, section 349¾, in 1935.

Respondents maintained at the trial that appellants waived their right to challenge the illegality of respondents' drilling operations by the acceptance of royalties. This question was decided contrary to respondents' contention in *Renner* v. *Huntington-Hawthorne Oil & Gas Co.*, 39 Cal.2d 93, 101 [244 P.2d 895]. The acceptance of royalties cannot be deemed any waiver of appellants' rights, nor an estoppel against their assertion.

Nevertheless, it would be strange indeed if the actual owners of the oil being removed, the adjacent landowners, were barred by law from indemnity for their loss, while these appellants and their predecessors were able to share handsomely in what they have inferentially characterized as ill-gotten gains and then more than two decades later urge illegality and immorality in support of their contentions.

At the time this instrument was executed, only one test of compliance therewith was available: the existence on the land of a well out of which oil was flowing in paying quantities. That test has been met at all times. In addition, uncontroverted expert testimony indicated Berry No. 4 did withdraw oil from resources directly beneath the leasehold involved herein,

however circuitous may have been its itinerary to the surface. Certainly that oil could not be said to be tainted with conversion, and alone would indicate Berry No. 4 was properly productive within the meaning of the deed.

The judgment is affirmed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied June 7, 1954, and appellants' petition for a hearing by the Supreme Court was denied July 14, 1954.