Filed 12/7/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TUFELD CORPORATION, | B314862 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC691352) |
| v. | |
| BEVERLY HILLS GATEWAY, L.P., | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis Landin, Judge.  Affirmed in part and reversed in part with directions.

Loeb & Loeb, Daniel G. Murphy and Daniel J. Friedman; Shoreline, and Andrew S. Pauly; Greines, Martin, Stein & Richland, Robin Meadow, David E. Hackett and Stefan Caris Love for Defendant, Cross-complainant and Appellant.

Miller Barondess, James Goldman and Mara Hashmall; Law Office of Bruce Adelstein and Bruce Adelstein for Plaintiff, Cross-defendant and Appellant.

————————————————

This is a commercial landlord-tenant dispute. Plaintiff, cross-defendant, and appellant Tufeld Corporation (Tufeld) is the landlord. Defendant, cross-complainant, and cross-appellant Beverly Hills Gateway L.P. (BHG) is the tenant.

The subject lease, as amended, has a term greater than 99 years. This contravenes Civil Code section 718,[1] which provides in relevant part: "No lease or grant of any town or city lot, which reserves any rent or service of any kind, and which provides for a leasing or granting period in excess of 99 years, shall be valid."

The main issue on appeal is whether a lease that violates section 718 is void or voidable. No published case has directly answered this question. It makes a difference here because if the lease is voidable, BHG can assert equitable defenses against Tufeld's claims for declaratory relief. We hold the part of the lease exceeding 99 years is void.

## BACKGROUND

Tufeld is a family-owned company founded in 1945. It owns prime commercial real property in Beverly Hills (the property). In 1960, pursuant to a ground lease, Tufeld rented the property to two original tenants. The annual rent was 6 percent of the appraised value of the property subject to periodic reappraisals. The lease term was for 98 years ending in 2058.

In 1964, the original tenants constructed an office building on the property. By 2003, Douglas Emmett Realty Fund 1997 (Douglas Emmett) had become the tenant.

---

[1]    Unless otherwise stated, all further statutory references are to the Civil Code.

On October 28, 2003, via two virtually simultaneous transactions, BHG purchased Douglas Emmett's interest in the ground lease. Douglas Emmett granted and assigned its interest to BHG and two other companies, and then those two companies immediately granted and assigned their interests to BHG. BHG borrowed money from a lender to finance these transactions.

In 2007, BHG wished to renovate the building on the property. To make its investment more attractive, BHG sought to extend the term of its tenancy.

On May 24, 2007, BHG and Tufeld executed an amendment to lease. Under this amendment, the lease term was extended to December 31, 2123, and future rent was increased to 6.5 percent of the appraised value of the property. BHG also agreed to pay Tufeld $1.5 million. Additionally, pursuant to a memorandum of agreement, Tufeld granted BHG a right of first refusal to match any bona fide written offer to buy any interest in the property.

In October 2007, BHG refinanced its loan, borrowing $47 million from a new lender. As part of that transaction, Tufeld signed an estoppel certificate confirming, among other things, that the lease "terminates on December 31, 2123." BHG subsequently invested about $8.8 million in renovations to the building on the property over several years.

In late 2016 or early 2017, Tufeld increased the monthly rent from $30,500 to $200,000 based on a scheduled reappraisal of the property's value. The parties litigated the reappraisal and rent increase in arbitration and court but settled the matter before a judgment was rendered.

In September 2017, BHG again refinanced its secured loan, this time borrowing $49 million. Tufeld signed a second estoppel certificate, confirming that BHG's lease "terminates on

December 31, 2123." BHG used some of the loan proceeds to make improvements to the building on the property.

In about December 2017 or January 2018, Tufeld's president Howard Tufeld learned that leases longer than 99 years are invalid under section 718. Mr. Tufeld had not consulted with a lawyer when he signed the documents for the 2007 lease amendment.

In January 2018, Tufeld commenced this action by filing a complaint for declaratory relief and quiet title against BHG in superior court. Tufeld sought an order cancelling the ground lease or, alternatively, an order cancelling the 2007 lease amendment on the ground the lease term exceeds 99 years.

BHG filed a cross-complaint for declaratory relief, unjust enrichment, and reformation. It sought a declaration that section 718 does not affect the ground lease. Alternatively, BHG prayed for a declaration that the ground lease is valid for a period of 99 years commencing in 2003 (or other proposed dates) and for restitution of sums by which Tufeld was unjustly enriched.

After a bench trial, the trial court issued a statement of decision and judgment, both of which were amended. The court concluded that BHG's acquisition of the lease in 2003 constituted a novation and that the lease term ended in 2102. The court further found the lease is void under section 718 to the extent its term exceeds 99 years. In light of this determination, the court concluded that BHG could not maintain its estoppel, laches, and waiver defenses.

Nonetheless, "to avoid an unnecessary retrial in the event of an appellate reversal," the trial court addressed the merits of BHG's equitable defenses. The court found that if estoppel, laches, and waiver are available, then the facts of this case

4

compel their application, requiring full enforcement of the ground lease term through 2123.

Both parties timely appealed.

## DISCUSSION

### I. *The Part of the Lease Exceeding 99 Years is Void*

We interpret statutes de novo. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*In re C.H.* (2011) 53 Cal.4th 94, 100.)

We start with the language of the statute. "If the statute's text evinces an unmistakable plain meaning, we need go no further. [Citation.] If it is ambiguous, we may consider a variety of extrinsic sources in order to identify the interpretation that best effectuates the legislative intent." (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 508.)

These extrinsic sources include the legislative history, the public policy underlying the statute, and the relevant statutory framework as a whole. (*S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379; *People v. Cole* (2006) 38 Cal.4th 964, 974.) "When examining a statute's legislative history, it is appropriate for courts to consider the timing and historical context of the Legislature's actions." (*MCI Communications Services, Inc. v. California Dept. of Tax & Fee Administration* (2018) 28 Cal.App.5th 635, 652.)

#### A. *The text of the statute*

The text of section 718 does not answer the question of whether a lease term that violates the statute is void or voidable. Section 718 does not use either term. Rather, it provides that no

lease with a term in excess of 99 years "shall be valid."  " 'Not valid' does not necessarily mean 'void.' " (*Safarian v. Govgassian* (2020) 47 Cal.App.5th 1053, 1067 (*Safarian*); accord *Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 532.)

B. *Historical context, legislative history, and public policy underlying the statute*

When California became part of the United States in 1848 and a state in 1850, it was not the global economic and cultural hub that it is today.  It was a remote region, far from the centers of political power and commerce, with a population of less than 100,000.  (U.S. Census Office, Ninth Census (1872) vol. I, table II, p. 14.)[2]

The California Legislature and courts immediately faced a chaotic state of the law.  (See Kleps, *The Revision and Codification of California Statutes 1849–1953* (1954) 42 Cal. L.Rev. 766 (Kleps); Parma, *The History of the Adoption of the Codes of California* (1929) 22 Law Libr. J. 8, 9.)  With a skeletal political and judicial infrastructure, "[t]he state's political authorities, such as they were, struggled to provide a legal order for a small and transitory population."  (Griffin, *California Constitutionalism:  Trust in Government and Direct Democracy* (2009) 11 U. Pa. J. Const. L. 551, 558.)

The Legislature considered whether to adopt an English common law system or a codified form of civil law.  (See Kleps,

---

[2]     We take judicial notice of California's approximate population in 1850 and 1870.  (Evid. Code, § 452, subds. (c) & (h); *Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1523, fn. 4.) This information can be found on the United States Census Bureau's website (https://www.census.gov).

*supra*, 42 Cal. L.Rev. at p. 766.) It chose the former. (*Ibid.*) Since the beginning of California's statehood, the common law of England has been the law of the state except where it conflicts with the United States Constitution or other California law. (Stats. 1850, ch. 95, now § 22.2.)

In the first two decades of statehood, California's law remained relatively undeveloped compared to the law of the far older and more populous states on the East Coast. Between 1850 and 1870, the Legislature made several unsuccessful attempts to enact more comprehensive statutes. (Kleps, *supra*, 42 Cal. L.Rev. at pp. 767–772.) The need to complete this task grew more urgent as the state rapidly developed. By 1870, the state's population had more than quintupled to over 560,000. (U.S. Census Office, Ninth Census, *supra*, vol. I, table II, p. 14.)

In 1872, the Legislature took a major step toward filling the gaps in California law by enacting four codes, including the Civil Code, which was primarily adopted from the Civil Code of the State of New York (1865) (Field Code). (*Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1200 (*Fluor*); *Estate of Duke* (2015) 61 Cal.4th 871, 880; *Standard Life Stock Co. v. Pentz* (1928) 204 Cal. 618, 640 (*Standard Life*).) The Field Code was a statutory scheme based on New York common law that was never enacted in New York. (*Fluor*, at p. 1200, fn. 33; *Estate of Duke*, at p. 880; *Standard Life*, at p. 640.) It was prepared by a commission headed by David Dudley Field. (*Fluor*, at p. 1200, fn. 33.)

When the Legislature enacted the Civil Code in 1872, it had before it a report prepared in 1871 by the California Code Commission. (*Fluor*, *supra*, 61 Cal.4th at p. 1200.) In the preface to its proposed Civil Code, the commission noted that the

common law was "found scattered throughout thousands of volumes of English and American reports and digests." (Code Comm., Revised Laws of the State of California (1871) at p. iv (Proposed Code); see Kleps, *supra*, 41 Cal. L.Rev. at p. 774 [commission presented proposed code].) The commissioners lauded the Field Code's scholarly summary of the common law and candidly stated, "We . . . avail ourselves of the exhaustive labors of the New York Commission." (Proposed Code, at p. iv.)

Section 718 was first enacted as part of the 1872 Civil Code. This version of the statute stated: "No lease or grant of any town or city lot, for a longer period than twenty years, in which shall be reserved any rent or service of any kind, shall be valid." (Former § 718, enacted by Stats. 1872.) The California Code Commission referred to an 1851 California statute[3] and section 203 of the Field Code (section 203)[4] as sources for former

_____

[3]     The 1851 statute stated: "No lands within this State shall hereafter be conveyed by lease or otherwise except in fee and perpetual succession, for a longer period than ten years; nor shall any town or city lots, or other real property, be so conveyed for a longer time than twenty years." (Stats. 1851, ch. 11, § 1.)

[4]     Section 203 stated: "Restrictions upon the power to affix qualifications to the right of enjoyment are contained in sections 14 and 15 of article I of the Constitution of the state." Section 14 of article I of the New York Constitution stated: "No lease or grant of agricultural land, for a longer period than twelve years, hereafter made, in which shall be reserved any rent or service of any kind, shall be valid." (N.Y. Const. 1846, art. I, § 14.) Section 15 of article I of the New York Constitution stated: "All fines, quarter sales, or other like restraints upon alienations, reserved in any grant of land hereafter to be made, shall be void." (N.Y. Const. 1846, art. I, § 15.)

8

section 718.  (See Proposed Code, *supra*, at p. 164.)  While section 718 has been amended numerous times, the critical language for our analysis has remained the same:  "No lease" with a term longer than a certain number of years "shall be valid."  Since 1911, the time limit has been 99 years.  (Stats. 1911, ch. 708, § 1.)

The Legislature's enactment of section 718 in 1872 must be placed in context.  At the time, article XI, section 16 of the California Constitution provided:  "No perpetuities shall be allowed, except for eleemosynary purposes."  (Cal. Const. of 1849, art. XI, § 16.)  The courts sometimes referred to indefinite leases as perpetuities.  For example, in *Morrison v. Rossignol* (1855) 5 Cal. 64, 65 (*Morrison*), the California Supreme Court held:  "A covenant for a lease to be renewed indefinitely at the option of the lessee, is, in effect, the creation of a perpetuity; it puts it in the power of one party to renew forever, and is therefore against the policy of the law."

"The common law judges were much concerned with preventing the tying up of estates for long periods of time." (*Estate of Sahlender* (1948) 89 Cal.App.2d 329, 335.)  "[W]hen property was tied up in such fashion, it was known as a 'perpetuity.' " (*Ibid.*)  Section 718 prohibits a "perpetuity" in real property.  (*Epstein v. Zahloute* (1950) 99 Cal.App.2d 738, 739; see also *Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873, 884–887.)

The courts developed rules to address perpetuities, including the rule against restraints on alienation and the rule against perpetuities.  (*Estate of Sahlender, supra,* 89 Cal.App.3d at pp. 335–336; see also *Estate of Harrison* (1937) 22 Cal.App.2d 28, 35 [discussing public policy against "tying up of property for an undue length of time"].)  To avoid confusion between the two rules, the rule against perpetuities is sometimes more accurately

9

referred to as the rule against remoteness in vesting. (*Estate of Sahlender*, at p. 335; *Victory Oil Co. v. Hancock Oil Co.* (1954) 125 Cal.App.2d 222, 230 (*Victory Oil*).)

The rule against perpetuities developed to curb excessive "dead-hand control" of property. (*Atlantic Richfield Company v. Whiting Oil and Gas Corporation* (Colo. 2014) 320 P.3d 1179, 1184.) In the nineteenth century, the rule was extended to commercial transactions. (See *Wong v. Di Grazia* (1963) 60 Cal.2d 525, 533 (*Wong*).)

"The traditional rule against restraints on alienation is based on the public policy notion that the free alienability of property fosters economic and commercial development." (*City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1426, fn. 4.) This remains the policy of California. The Legislature has declared: "Real property is a *basic resource of the people of the state* and should be made freely alienable and marketable to the extent practicable in order to enable and encourage full use and development of the real property. . . ." (§ 880.020, subd. (a)(1), italics added.)

When the Legislature enacted section 718, the rule against perpetuities and the rule against restraints on alienation were part of the common law of England and California. (See *Victory Oil*, *supra*, 125 Cal.App.2d at pp. 227–230; *Estate of Sahlender*, *supra*, 89 Cal.App.2d at p. 340.) Likewise, *Morrison* held indefinite leases were invalid perpetuities under California law. (*Morrison*, *supra*, 5 Cal. at p. 65.) We presume the Legislature knew of this common law when it enacted section 718. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 156; *Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 221.)

The Legislature's subsequent revision of the law relating to perpetuities sheds more light on the matter. In 1991, the Legislature abolished the application of the rule against perpetuities (the rule against remoteness in vesting) in commercial transactions with the enactment of the Uniform Statutory Rule Against Perpetuities (Prob. Code, § 21200 et seq.; Uniform Act).[5] (*Shaver v. Clanton* (1994) 26 Cal.App.4th 568, 574 (*Shaver*).) The Legislature determined that the rationale for the rule against perpetuities did not support its application to commercial transactions. (*Ibid.*)

By adopting the Uniform Act while preserving section 718, "the Legislature intended the two statutes to be read together." (*Shaver*, *supra*, 26 Cal.App.4th at p. 576.) When that is done, the rule is that commercial leases are exempt from the Uniform Act, but for the period they are longer than 99 years, they are not valid under section 718. (*Ibid.*)

BHG argues that section 718's purpose is to protect tenants, not landlords. According to BHG, New York's constitutional prohibition against indefinite leases was enacted to protect tenants. Although BHG concedes New York's prohibition "arose from circumstances unique to rural New York in the late 1700s and early 1800s," it argues that section 718, too, was enacted to protect tenants because it was "based on" New York law.

---

[5]     Prior to its repeal, former section 715.2 codified the rule against perpetuities. Like section 718, former section 715.2 was in division 2, part 1, title 2, chapter 2, article 3 of the Civil Code.

11

When the Field Code was drafted, the New York Constitution prohibited leases of agricultural land greater than 12 years.  (See *ante*, fn. 4.)  The purpose of this prohibition was to ameliorate "the feudal tenure of agricultural lands" that existed in New York.  (*Parthey v. Beyer* (N.Y. App. Div. 1930) 228 A.D. 308, 312.)  The public policy in New York "was originally designed to protect the State and the inhabitants thereof from the consequences of long leases of agricultural lands and the consequences of the depreciation resulting therefrom because of the exhausting of the farm lands during the course of occupancies under long leases.  This public policy [was] primarily for the benefit of the public and only incidentally for the benefit of private individuals."[6]  (*Ibid.*)

We are unpersuaded by BHG's argument.  BHG's claim that section 718 was "based on" New York law is not entirely accurate.  As we have explained, the source of the statute was both an 1851 California statute that predated the Field Code and section 203 of the Field Code, which referred to the New York Constitution.  The language of both sources is significantly different than section 718.  (See *ante*, fns. 3 & 4.)

Moreover, prior to the enactment of section 718, our Supreme Court held that a lease giving the lessee unlimited power to renew was an invalid perpetuity contrary to public policy.  (*Morrison*, *supra*, 5 Cal. at p. 65.)  The *Morrison* court thus recognized that indefinite leases are against public policy

---

[6]  "New York has discarded the provision in its current constitution.  *See* N.Y. Const., art. I, § 10 (repealed 1962) (repealing the provision on agricultural leases, which had been renumbered as article I, section 10 in 1938.)"  (*Gansen v. Gansen* (Iowa 2016) 874 N.W.2d 617, 624 (*Gansen*).)

*even if they benefit tenants.*  We have no reason to believe the Legislature intended to abrogate this principle when it enacted section 718.

In *Gansen*, the Iowa Supreme Court rejected an argument similar to the one BHG makes here.  The issue was whether a lease violated article I, section 24 of the Iowa Constitution (article I, section 24), which prohibits agricultural leases longer than twenty years.

The court acknowledged that article I, section 24 was "copied" from the New York Constitution (*Gansen, supra*, 874 N.W.2d at p. 624), and "that historically, article I, section 24 was intended in large part to protect agricultural tenants who suffered due to oppressive long-term relationships with established landlords." (*Id.* at p. 626.)  "Yet," the court held, "the language of article I, section 24 does not run solely in favor of the tenant.  The language instead is couched in more general terms and does not distinguish between the interests of landlords and tenants.  While the language obviously is sufficiently broad to protect tenants from being locked into oppressive leases, it also appears to advance the larger purpose of promoting the alienation of agricultural lands by not excluding landlords from its terms." (*Ibid.*)

Similarly, nothing in the language of section 718 indicates that the statute only protects tenants.  The broad language of the statute advances the larger public policy purpose of not tying up land for an excessive period.  BHG cites no authority supporting the proposition that when the Legislature enacted section 718, it only intended to protect tenants.

BHG focusses too narrowly on New York law.  The general policy disfavoring perpetuities first developed as part of the

13

common law of England—not New York—before the founding of the United States, and then was adopted by American courts. (*Estate of Sahlender*, *supra*, 89 Cal.App.2d at pp. 335–336; *Wong*, *supra*, 60 Cal.2d at p. 533; *Shaver*, *supra*, 26 Cal.App.4th at pp. 572–573.)

When the Legislature enacted section 718 in 1872, it was seeking to promulgate a statutory scheme that generally followed the common law of England and the United States.  The Legislature utilized the Field Code as a scholarly work and a convenient means of achieving that goal.  There is no reason to believe the Legislature was particularly interested in New York law, much less law that addressed the unique needs of that state.

The public policy underlying section 718's application to commercial leases is that excessively long leases—those lasting a century or more—unduly hinder the use, development, and marketability of real property.  Perpetuities are problematic because it is very difficult for the current generation to predict conditions future generations will face.  (Korngold, *Resolving the Intergenerational Conflicts of Real Property Law: Preserving Free Markets and Personal Autonomy for Future* Generations (2007) 56 Am. U. L.Rev. 1525, 1555–1556.)  "Future generations deserve the opportunity to find the solutions to the problems of their day, and they most likely will have greater success than people long gone from the scene."  (*Id.* at p. 1556.)

We recognize that respected commentators have advocated placing no limits on the terms of commercial leases.  (See Rest.2d Prop., Landlord and Tenant, § 1.4.)  But we do not pass judgment on the wisdom of the public policy the Legislature seeks to promote.  (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 365 [courts should not substitute their policy

14

judgments for the Legislature's].)  Our task is to interpret the statute to effectuate the law's purpose and underlying policy.

   C.   *A lease term that violates section 718 is void*

Several cases have indicated that a lease violating section 718 or its companion statute, section 717,[7] is "void."  (See *Harter v. San Jose* (1904) 141 Cal. 659, 667  (*Harter*) [lease "would not be void, except as to the excess of the period"]; *Kendall v. Southward* (1957) 149 Cal.App.2d 827, 828, 830 (*Kendall*) [lease exceeding the statutory time limit is void per se]; *Fisher*, *supra*, 213 Cal.App.2d at p. 842 [quoting *Kendall*]; *Shaver*, *supra*, 26 Cal.App.4th at p. 576 [quoting *Harter*].)  These cases, however, do not squarely address the issue of whether the lease is void or voidable.

"A void contract is without legal effect.  (Rest.2d Contracts, § 7, com. a.)  'It binds no one and is a mere nullity.' " (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929 (*Yvanova*).)  "A voidable transaction, in contrast, 'is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.' (Rest.2d Contracts, § 7.)" (*Yvanova*, at p. 930.)  Thus, if a contract is void and not merely voidable, the equitable defenses of

_____

   **7**   Section 717 provides:  "No lease or grant of land for agricultural or horticultural purposes for a longer period than 51 years, in which shall be reserved any rent or service of any kind, shall be valid."  This statute was enacted as part of the 1872 Civil Code and has since been amended.  Cases interpreting section 717 can sometimes shed light on section 718.  (See *Fisher v. Parsons* (1963) 213 Cal.App.2d 829, 842 (*Fisher*).)

15

estoppel, laches, and waiver do not apply.  (*Colby v. Title Ins. & Trust Co.* (1911) 160 Cal. 632, 644 (*Colby*); *Tatterson v. Kehrlein* (1927) 88 Cal.App. 34, 49 (*Tatterson*).)

The law regarding the illegality of contracts is sometimes confusing and difficult to understand.  (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344 [" 'Illegality of contracts constitutes a vast, confusing and rather mysterious area of the law' "].)  Generally, when a contract or a provision in a contract is prohibited by a statute, it is void.  (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 291 (*Asdourian*), superseded by statute on other grounds as noted in *Construction Financial v. Perlite Plastering Co.* (1997) 53 Cal.App.4th 170, 175; *Vitek, Inc. v. Alvarado Ice Palace, Inc.* (1973) 34 Cal.App.3d 586, 591 (*Vitek*); 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 432.)  While there are several exceptions to this rule, none apply here.  We shall address the exceptions raised by BHG's briefs.

1.    *Statutes that protect specific parties and are not for the public benefit*

"The words 'void' or 'invalid,' when appearing in statutes which are not for the benefit of the public at large, are regarded as equivalent to 'voidable' where none other than a particular person or class of persons is the object of the statutory protection."  (*Estate of Reardon* (1966) 243 Cal.App.2d 221, 229.)  This exception to the general rule is consistent with a maxim of jurisprudence:  "Any one may waive the advantage of a law intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement."  (§ 3513.)

The exception applies if there is merely an "incidental benefit to the public from a statutory right."  (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048, fn. 4.)  Otherwise, the

exception would almost never apply because it is difficult to conceive of a statutory right that does not have some benefit to the public. (*Id.* at p. 1049, fn. 4.)

Here, contrary to BHG's assertion, section 718 does not only protect tenants; it protects landlords too. Moreover, as we have explained, the legislative purpose of section 718 serves to promote a public benefit. The private benefit exception does not apply to section 718.

### 2. *Statute of frauds and similar evidentiary statutes*

One kind of statute that primarily benefits parties to a contract and not the public at large is the statute of frauds and similar evidentiary statutes. A contract made in contravention of the statute of frauds is voidable, not void. (*O'Brien v. O'Brien* (1925) 197 Cal. 577, 586.)

In *Safarian*, we held that a marital property agreement that does not meet the transmutation requirements of Family Code section 852 (section 852) is voidable by the parties and cannot be challenged as void by third parties. (*Safarian*, *supra*, 47 Cal.App.5th at p. 1059.) This is because section 852 "establishes a rule of evidence, similar to the statute of frauds," and does not benefit the public at large. (*Id.* at p. 1068.) Contrary to BHG's assertion, *Safarian* does not support its position. Section 718 is not a rule of evidence or its equivalent that concerns only the parties to a lease.

### 3. *The part of the lease that violates section 718 is void even though it is malum prohibitum*

In deciding whether a contract that violates a statute is void or voidable, courts sometimes consider whether the contract is malum in se (inherently immoral) or malum prohibitum (illegal

17

by statute). A malum in se contract is absolutely void. (*Vitek*, *supra*, 34 Cal.App.3d at p. 593.) A malum prohibitum contract is "void or voidable according to the nature and effect of the act prohibited." (*Ibid.*) A malum prohibitum contract is void "if it falls within the area which the Legislature intended as part of deterrence necessary to protect the public interest." (*Ibid.*)

The lease here is malum prohibitum because section 718 does not bar any immoral conduct. Nonetheless, to the extent the lease term is longer than 99 years,[8] it is void because it contravenes the public policy underlying section 718.

BHG's reliance on *Vitek* and *Asdourian* is misplaced. Under the particular facts of those cases, contractors who violated the provisions of the Contractors State License Law (Bus. & Prof. Code, § 7000 et seq.) were permitted to recover against their clients. In both cases, enforcement of the contract did not defeat the policy of the statutory scheme. (*Vitek*, *supra*, 34 Cal.App.3d at p. 594 [the statutory policy would not be "frustrated" by allowing enforcement of the contract]; *Asdourian*, *supra*, 38 Cal.3d at p. 292 [enforcement of the contract would not "defeat the statutory policy"].) The same is not true here.

## II. *The 2003 Assignment Was a Novation That Reset the 99-Year Limit*

The trial court ruled the 2003 assignment was a novation that reset the 99-year time limit of section 718. Tufeld argues the 2003 assignment did not result in a novation and, if it did,

---

[8] In section III *infra*, we explain that a lease that violates section 718 is not void in its entirety.

18

the 99-year limit did not start anew.  We reject Tufeld's arguments.

A.     *There was a novation that created a new lease*

"Novation is the substitution of a new obligation for an existing one." (§ 1530.)  "The substitution is by agreement and with the intent to extinguish the prior obligation." (*Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 431 (*Wells Fargo*).)  In the context of a lease, a novation occurs if a new tenant is substituted for an old one and the parties intend to release the old tenant of all obligations.  (*Id.* at pp. 431–432; § 1531, subd. 2.)  The landlord may agree to such novation in advance in the underlying lease.  (*Wells Fargo*, at p. 432.)

That is what happened here.  The ground lease provides that the tenant may assign "all of its right, title and interest" in the lease to a third party.  The lease further provides that "upon such assignment or transfer, the liabilities and other obligations under this lease of the assignor who shall have so assigned shall cease and terminate to the extent not theretofore accrued or incurred."  The 2003 transactions therefore resulted in a novation.

A novation "amounts to a new contract which supplants the original agreement and 'completely *extinguishes* the original obligation . . . .' " (*Wells Fargo*, *supra*, 32 Cal.App.4th at p. 431.)  Accordingly, in 2003, the ground lease was nullified (*id.* p. 432; *People ex rel. Department of Public Works v. Auman* (1950) 100 Cal.App.2d 262, 263) and a new lease between Tufeld and BHG was created.  (*Alexander v. Angel* (1951) 37 Cal.2d 856, 862 [novation abrogates the existing agreement and "the rights and duties of the parties must be governed by the new agreement alone"]; *Wells Fargo*, at p. 435 ["a novation creates a new

19

obligation which contemplates a new agreement among all the contracting parties"].)

B.  *The novation did not extend the term of the lease beyond 2058 but did reset the 99-year limit*

"Novation is made by contract, and is subject to all the rules concerning contracts in general." (§ 1532.)  A fundamental rule of contract formation and interpretation is that the terms of a contract are determined by the parties' objective manifestations of consent.  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632; §§ 1550, 1565.)

Turning to the ground lease, successor tenants, including Douglas Emmett and BHG, had no right or power to change the terms of the lease without Tufeld's consent.  Tufeld did not give such consent in 2003.  Therefore, the new lease between Tufeld and BHG incorporated all the substantive terms of the ground lease, including its expiration in 2058.

While the 2003 novation did not change the date the lease expired, it did reset the clock on the 99-year limit of section 718.  Section 718 thus limits the lease term to 2102.

This case is like *Wells Fargo*.  There, in 1981, a transfer of a 1929 lease resulted in a novation, "nullifying" the old lease. (*Wells Fargo*, *supra*, 32 Cal.App.4th at p. 432.)  At issue was a 1977 federal statute that applied to obligations issued after its enactment.  The court held that the statute applied to the new tenant's obligations under the new lease.  (*Id.* at pp. 435–436.) Similarly, section 718 applies to the 2003 new lease between Tufeld and BHG, not the nullified ground lease between Tufeld and its original tenants.

20

## III. *The 2007 Lease Amendment Does Not Invalidate the Entire Lease*

Under the 2007 amendment, the lease expires on December 31, 2123. This extends its term beyond the 2102 limit set by section 718. Tufeld argues the trial court erred in ruling that only the period of the lease longer than 99 years is void. It contends the entire lease, as amended, is void because it is an unlawful contract.

"If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124; accord *County of Ventura v. City of Moorpark* (2018) 24 Cal.App.5th 377, 393.)

The central purpose of the lease is to rent the property. Its invalid extension beyond 99 years is collateral to that purpose and does not taint the entire contract. The trial court therefore correctly ruled the lease is void only for the period that exceeds 99 years. (See *Harter*, *supra*, 141 Cal. at p. 667 [lease is not void, "except as to the excess of the period"]; *Kendall*, *supra*, 149 Cal.App.2d at p. 830 [lease void under section 717 only to the extent it is longer than permitted term]; *Shaver*, *supra*, 26 Cal.App.4th at p. 576 [quoting *Harter*].)[9]

---

[9] Because we hold the 2007 amendment is void in part, we do not reach the parties' arguments regarding BHG's estoppel, laches, and waiver defenses. (*Colby*, *supra*, 160 Cal. at p. 644; *Tatterson*, *supra*, 88 Cal.App. at p. 49.)

21

## IV.   *Restitution*

### A.   *The trial court did not abuse its discretion by awarding restitution*

Pursuant to the 2007 lease amendment, the lease was extended 65 years to 2123.  The trial court, however, correctly found that under section 718, the lease term ended in 2102.  The court also awarded BHG restitution on the ground "Tufeld was unjustly enriched as a result of the reduction of the lease term by 21 years."

The trial court has "inherent equitable power" to award restitution when it finds one party has been unjustly enriched. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177.)  We review the trial court's order awarding restitution for abuse of discretion.  (See *Pulte Home Corp. v. CBR Electric, Inc.* (2020) 50 Cal.App.5th 216, 228 [appellate courts review the trial court's exercise of inherent equitable power for abuse of discretion]; *Holmes v. Williams* (1954) 127 Cal.App.2d 377, 379–380 [restitution award reviewed for abuse of discretion].)

"Generally, one who is unjustly enriched at the expense of another is required to make restitution.  [Citation.]  The elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.' " (*Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 238.)

The trial court's award of restitution to BHG was not an abuse of discretion.  Tufeld received a benefit from BHG, namely $1.5 million.  In return, Tufeld agreed to a 65-year lease extension.  But because 21 years of the lease extension are void, BHG did not receive what it bargained for and Tufeld did not

22

deliver what it agreed to provide. Under these circumstances, an award of restitution is readily justified.

B. *There was substantial evidence supporting the amount of the restitution award*

The trial court awarded $484,615 in restitution to BHG. It calculated this number by multiplying the $1.5 million Tufeld received under the 2007 lease amendment by the proportion of the term extension that it deemed void (21 ÷ 65). We must affirm the amount of restitution awarded by the trial court if it is supported by substantial evidence. (*In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 792; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 700.)

As the trial court noted, the parties did not provide any "reliable alternatives" to the pro rata method it used. Further, neither party has cited any authority providing specific guidance on how to calculate restitution in a case like this.

The courts have long distinguished between the proof needed to establish liability and the proof required to establish the amount of damages. "Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873; accord *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774.)

The same principle applies to restitution. Where, as here, unjust enrichment is established with reasonable certainty, the amount of restitution need not be calculated with absolute certainty. A reasonable approximation will suffice. (See

23

*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1487–488; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 894.)

The trial court's restitution award was a reasonable approximation of the amount BHG was entitled to recover. There was substantial evidence supporting the court's finding.

C.      *The trial court did not apply the correct legal standard in deciding whether to award prejudgment interest*

We review de novo whether the trial court applied an incorrect legal standard. (*Gou v. Xiao* (2014) 228 Cal.App.4th 812, 817.)

The trial court rejected BHG's claim for prejudgment interest on its restitution award. It did so after concluding that section 3287, subdivision (a), only applies to "damages." While that is true, the court had discretion in equity to award prejudgment interest as a component of restitution. (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 375; *M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1539.) The court, however, did not consider its equitable discretion in deciding whether to award prejudgment interest. This was error. On remand the trial court is directed to consider whether it should award prejudgment interest as a component of restitution.

## DISPOSITION

The judgment is affirmed in part and reversed in part and the matter is remanded for the trial court to consider whether to grant BHG prejudgment interest on restitution.  The parties shall bear their own costs on appeal.


TAMZARIAN, J. [*]


We concur:


RUBIN, P. J.


MOOR, J.

---

[*]	Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25